Terrence L. HILL, Petitioner,

v.

Gerald HOFBAUER, Respondent.

No. CIV.A.00–CV–70960–DT.

United States District Court, E.D. Michigan, Southern Division.

Nov. 1, 2001.

Corbett E. O'Meara, Grosse Pointe, MI, for Terrance Hill, petitioner.

Laura G. Moody, Michigan Department of Attorney General, Habeas Corpus Division, Lansing, MI, Vincent J. Leone, Michigan Department of Attorney General, Habeas Corpus Division, Lansing, MI, for Jerry Hofbauer, Warden, respondent.

## OPINION AND ORDER CONDITIONALLY GRANTING PETITION FOR A WRIT OF HABEAS CORPUS [1]

TARNOW, District Judge.

Petitioner Terrence L. Hill, a state prisoner confined at the Marquette Branch Prison in Marquette, Michigan, and represented by Corbett Edge O'Meara, has filed a petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254.[2] Petitioner was convicted of second-degree murder, M.C.L. 750.316(1)(b) and assault with intent to rob while armed, M.C.L. 750.89, following a jury trial in the Genesee County Circuit Court in 1997. He was sentenced to life imprisonment on the murder conviction and 15 to 30 years imprisonment on the assault with intent to rob conviction.

In his petition, Petitioner claims that the trial court violated his Confrontation Clause rights by admitting the un-redacted statements of a non-testifying co-defendant as evidence against him at trial. Petitioner also claims that the Michigan Court of Appeals' conclusion that these un-redacted statements were properly admitted under Michigan's hearsay rules is contrary to federal constitutional law and/or constitutes an unreasonable application of that law. For the reasons stated below, the petition for a writ of habeas corpus is CONDITIONALLY GRANTED.

## I. *Relevant Facts*

Petitioner's convictions stem arise the shooting death of Jermaine Johnson during an armed robbery at Mr. Johnson's home in Flint, Michigan on August 24, 1995. Petitioner was tried with the co-defendant Jabbar Priest Bulls ("Jabbar Bulls" or "Bulls"), the alleged instigator of the robbery. Deonte Matthews, the alleged shooter and alleged third participant in the robbery, was not brought to trial.

The following facts are adapted in part from this Court's decision in *Bulls v. Jones*, 86 F.Supp.2d 746, 747–49 (E.D.Mich.2000).

The testimony presented at trial revealed that Mr. Johnson's neighbors overheard the robbery and shooting, saw two men flee the scene, and contacted police. When police arrived, they found Mr. Johnson dead in his home from a shotgun wound to his head. Based upon the neighbors' description of one of the fleeing men, police picked up [Petitioner] who was walking a few blocks from Mr. Johnson's home. [Petitioner] denied knowledge of the robbery, did not exhibit evidence of involvement in the robbery, and was released from custody.

One year later, Mekia Randle, [Jabbar Bulls's] ex-girlfriend, informed police that [Bulls] had told her about his participation in the robbery of Mr. Johnson. Ms. Randle described aspects of the incident that had not been revealed to the public. Based upon her report, [Jabbar Bulls] was arrested and brought in for questioning. While in police custody, [Jabbar Bulls] made statements to the investigating officers implicating himself, [Petitioner], and Deonte Matthews ["Mr. Matthews"] in the robbery. Police subsequently arrested [Petitioner] and Mr. Matthews. While in custody, [Petitioner] made several statements to

1. Staff Attorney Martin Cadwell provided quality research assistance in the preparation of this opinion and order.

2. Petitioner is identified in his habeas petition submitted by counsel as Terrence Hill. Petitioner is identified in the trial transcripts and in the opinion of the Michigan Court of Appeals affirming his convictions as Terance Lasean Hill. Petitioner is identified in the order of the Michigan Supreme Court denying leave to appeal as Terrence Lesean Hill. This Court shall use the spelling Petitioner has used in his habeas petition submitted by counsel.

police implicating [Jabbar Bulls] and Mr. Matthews in the robbery. [Petitioner] downplayed his own role in the incident[, asserting that he abandoned the robbery before Bulls and Matthews entered the victim's home].[3]

During trial, over defense objection, the trial court admitted the un-redacted statements of both [Jabbar Bulls] and [Petitioner] into evidence even though neither defendant testified. Police Sergeant Rick Warren recounted his interviews with [Jabbar Bulls] and [Petitioner] and read their formal statements into evidence at trial.

According to Sergeant Warren, [Jabbar Bulls] initially denied being involved in the robbery, but admitted his participation when confronted with a partial tape recording of Ms. Randle's police interview. In his formal statement, Jabbar Bulls explained that Mr. Johnson approached him on the street and sexually propositioned him. [Bulls] accompanied Mr. Johnson to his home, but made an excuse to leave before engaging in any sexual acts, indicating that he would return at a later time. [Bulls] then walked to Mr. Matthews's house and proposed the robbery to Matthews and [Petitioner]. [Bulls] admitted that he asked Mr. Matthews if he had a gun and Matthews retrieved a shotgun from his house to use during the robbery. [Jabbar Bulls], Mr. Matthews, and [Petitioner] walked to Mr. Johnson's house. When Mr. Johnson answered the door, [according to Jabbar Bulls's statement, Bulls] and Matthews pushed their way into the house while [Petitioner] remained outside as a look-out.

Once inside the house, Mr. Matthews held the gun on Mr. Johnson while [Bulls] began searching the house. While [Bulls] was preparing to search an upstairs bedroom, Mr. Matthews attempted to search another room. [Bulls] then heard footsteps running down the stairs followed by a gunshot. [Bulls] went to the top of the stairs and saw Mr. Johnson lying at the bottom of the stairs with a head injury. [Bulls] asked Mr. Matthews why he had fired the shotgun. Mr. Matthews replied that Mr. Johnson had tried to run. [Jabbar Bulls] then ran down the stairs, left the house, and fled to Mekia Randle's house. [Bulls] told Ms. Randle what had occurred the next morning. In a subsequent statement to police, [Bulls] also admitted that Mr. Matthews had taken a watch from Mr. Johnson's home, but threw it in some bushes after they fled the scene. Sergeant Warren acknowledged that [Bulls] never expressed an intent to shoot or kill Mr. Johnson.

Sergeant Warren also interviewed [Petitioner] several times following his arrest. [Petitioner] initially denied knowing about the robbery, but admitted being involved when confronted with information obtained from the other interviews. [Petitioner made at least four statements to Sergeant Warren.] [Petitioner] indicated that [Jabbar Bulls] proposed the robbery to him and that the initial plan was for [Bulls] to gain access to Mr. Johnson's house, to beat and tie up Mr. Johnson, and then let [Petitioner] into the house to help him carry out clothing, jewelry, electronic equipment, and other valuables. Petitioner and

---

**3.** It does not appear from the record that Mr. Matthews made any statements to police. In fact, Petitioner asserts that Mr. Matthews was not brought to trial because the only evidence against him were his co-defendants' statements to the police. Mr. Matthews's case was dismissed after the judge at the preliminary examination agreed with the prosecutor that the use of the statements of Bulls and Petitioner against Mr. Matthews would violate *Bruton.*

[Jabbar Bulls] encountered Mr. Matthews while walking to Mr. Johnson's house. [Bulls] and Mr. Matthews spoke and [Bulls] informed [Petitioner] that Mr. Matthews was going to join them. Mr. Matthews ran back to his house, and [Bulls] told [Petitioner] that Mr. Matthews had "some heat" and that it would be easier to commit the robbery with a gun. According to [Petitioner, Bulls] also stated, "We're going to be okay, as long as he [Mr. Matthews] doesn't kill him." [Petitioner] claimed that once [Bulls] and Mr. Matthews entered Mr. Johnson's house, he walked away instead of serving as a look-out.

*Bulls v. Jones,* 86 F.Supp.2d at 747–49.

Petitioner admitted knowing that a robbery was going to take place, that Bulls told him Matthews was armed, and hearing a shot some time after Bulls and Matthews entered Mr. Johnson's home. Petitioner recounted this information in his statement to the police.

Petitioner asserted that he abandoned the robbery before Bulls and Matthews entered Mr. Johnson's house. Petitioner also denied seeing Bulls or Matthews with a gun before the robbery. In his final statement to the police, Petitioner claimed that he asked Bulls several times why Matthews was armed before they got to Mr. Johnson's home. Petitioner claimed Bulls told him that having a gun would make perpetrating the robbery easier. In his first three statements to the police, Petitioner admitted approaching Mr. Johnson's house with Bulls and Matthews on foot, but stated that he abandoned the robbery as Bulls and Matthews were walking up Mr. Johnson's driveway. On one occasion, Petitioner told Sergeant Warren that a voice in his head told him "This ain't right. Leave" and so he left, abandoning the robbery scheme, before Bulls and Matthews entered Mr. Johnson's home. In his final statement to the police, however, Petitioner admitted going to the back door of Mr. Johnson's home, hearing Jabbar Bulls open the screen door in the front of the house, knock on the door, and converse with Mr. Johnson, before he (Petitioner) decided to leave. This last statement placed Petitioner very near Mr. Johnson's house either immediately before Bulls and Matthews entered, or while they were entering.

Petitioner denied being present when the shooting occurred, although he admitted hearing a shot as he was walking away. Petitioner stated that he only learned what had happened to Mr. Johnson inside the house when he spoke to Matthews the day after the robbery.

Mekia Randle testified for the prosecution. Ms. Randle testified that Jabbar Bulls, her ex-boyfriend, told her that he and a "D–Mack" had robbed a guy and that D–Mack shot him in the head, blowing off part of the victim's skull and splattering his brains. On further questioning, Ms. Randle testified that Bulls had told her that he committed the robbery with "a couple of his boys" or "one of the twins," and that she did not know the identity of anyone who went into Mr. Johnson's house other than Jabbar Bulls. On cross-examination by Petitioner's counsel, Ms. Randle stated that she did not know who participated in the robbery with Jabbar Bulls.

As noted, neither Petitioner nor Bulls testified at trial. At the close of trial, defense counsel argued that Petitioner never entered Jermaine Johnson's home, but that Bulls and Matthews did. Defense counsel further argued that Petitioner abandoned his participation in the robbery and did not act as a lookout, as evidenced by Petitioner's statement to this effect and the testimony of witnesses who saw two men fleeing the scene together after the shot was heard. Defense counsel argued that the two men seen fleeing together

were Bulls and Matthews. The jury, however, found Petitioner guilty of second-degree murder and assault with intent to rob while armed, rejecting Petitioner's defense that he abandoned his role in the robbery before Bulls and Matthews entered Mr. Johnson's home.[4] The trial court sentenced Petitioner to life imprisonment with the possibility of parole for second-degree murder and 15 to 30 years imprisonment for the assault conviction.

## II. *Procedural History*

Following his convictions and sentencing, Petitioner filed an appeal as of right with the Michigan Court of Appeals, asserting that the trial court erred in admitting co-defendant Bulls's un-redacted out-of-court statement at their joint trial. The Court of Appeals affirmed Petitioner's convictions in an unpublished, *per curiam* opinion. *People v. Hill*, No. 202849, 1998 WL 1989786 (Mich.App. Sept. 25, 1998). Petitioner filed an application for leave to appeal with the Michigan Supreme Court raising the same issues, which was denied in a standard order. *People v. Hill*, 460 Mich. 862, 598 N.W.2d 343 (1999).

Petitioner, through counsel, filed the present habeas petition on June 20, 2000, raising the following claim as grounds for relief:

> I. The trial court violated the Sixth Amendment Confrontation Clause by admitting, over objection, the non-testifying co-defendant's statements as evidence against Mr. Hill. The trial court committed patent *Bruton* error by admitting the non-testifying co-defendant's police statement as evidence of Mr. Hill's guilt.

Respondent filed an answer to the petition on December 11, 2000, asserting that the habeas petition should be dismissed for lack of merit.

## III. *Standard of Review*

The provisions of the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), Pub.L. No. 104–132, 110 Stat. 1214 (April 24, 1996), govern this case because Petitioner filed this habeas petition after the AEDPA's effective date. See *Lindh v. Murphy*, 521 U.S. 320, 336, 117 S.Ct. 2059, 138 L.Ed.2d 481 (1997). The AEDPA provides:

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim—
>
> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d) (1996).

This court must defer to the state court's legal conclusions unless they are contrary to or unreasonably apply clearly established federal law as determined by the United States Supreme Court. 28 U.S.C. § 2254(d)(1). This Court must defer to the state court's factual conclusions unless they are based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding. 28 U.S.C. § 2254(d)(2).

■ Additionally, § 2254(e)(1) requires that this Court presume the correctness of state court factual determinations. A habeas petitioner may rebut this presumption of correctness only with clear and

---

**4.** Jabbar Bulls was convicted of first degree felony murder, assault with intent to rob while armed, and felony firearm. *Bulls v. Jones*, 86 F.Supp2d at 746.

convincing evidence. *Warren v. Smith,* 161 F.3d 358, 360–61 (6th Cir.1998), *cert. denied,* 527 U.S. 1040, 119 S.Ct. 2403, 144 L.Ed.2d 802 (1999).

In *Williams v. Taylor,* 529 U.S. 362, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000), the United States Supreme Court undertook a detailed analysis of the correct standard of habeas corpus review under the AEDPA. In *Williams,* the Supreme Court stated that habeas relief may only be granted where a state prisoner's confinement is based on a state court decision which is either 1) contrary to federal constitutional law, 2) an objectively unreasonable application of federal constitutional law, or 3) an unreasonable determination of the facts. A state court decision is contrary to Supreme Court precedent if the state court arrives at a conclusion opposite to that reached by the Supreme Court on a question of law or "if the state court confronts facts that are materially indistinguishable from a relevant Supreme Court precedent and arrives at a result opposite to [theirs]." *Williams v. Taylor,* 529 U.S. at 405, 120 S.Ct. 1495. A state court decision will be deemed to be "objectively unreasonable" if "the state court identifies the correct governing legal rule from [the Supreme Court's] cases but unreasonably applies it to the facts of the particular state prisoner's case ... [or] if the state court either unreasonably extends a legal principle from [Supreme Court] precedent to a new context where it should not apply

or unreasonably refuses to extend that principle to a new context where it should apply." *Id.* at 376, 407, 120 S.Ct. 1495.

In evaluating a state court decision under the "unreasonable application" clause, the Supreme Court further stated that a federal habeas court "should ask whether the state court's application of clearly established federal law was objectively unreasonable." *Id.* at 1522. "Under § 2254(d)(1)'s 'unreasonable application' clause, then, a federal habeas court may not issue the writ simply because the court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable." *Id.* The Supreme Court also clarified that the phrase "clearly established Federal law, as determined by the Supreme Court of the United States," refers only to "the holdings, as opposed to the dicta, of [the Supreme Court's] decisions as of the time of the relevant state-court decision." *Id.* at 1523. In determining what constitutes clearly established federal law, therefore, a federal habeas court is restricted to pertinent United States Supreme Court precedent.[5]

## IV. Discussion

Petitioner claims that he was denied a fair trial because the trial court admitted co-defendant Bull's un-redacted police statements, which implicated Peti-

---

5. This does not mean, however, that the decisions of lower federal courts are irrelevant. This Court is bound by pertinent decisions of the United States Court of Appeals for the Sixth Circuit. *See Timmreck v. United States,* 577 F.2d 372, 374 n. 6 (6th Cir.1978), rev'd on other grounds, 441 U.S. 780, 99 S.Ct. 2085, 60 L.Ed.2d 634 (1979); *Conrad v. Rofin–Sinar, Inc.,* 762 F.Supp. 167, 172 (E.D.Mich.1991). Thus, to the extent that the Sixth Circuit has held that certain Supreme Court cases "clearly establish" federal law in certain respects, this Court is bound by those

determinations, regardless of whether this Court would interpret the Supreme Court precedent differently. Further, although the federal court is limited to Supreme Court precedent in determining whether a particular right is clearly established, "[t]o the extent that inferior federal courts have decided factually similar cases, reference to those decisions is appropriate in assessing the reasonableness *vel non* of the state court's treatment of the contested issue." *O'Brien v. Dubois,* 145 F.3d 16, 25 (1st Cir.1998).

tioner in the robbery and shooting, into evidence at trial. Bulls's statement said that Petitioner "stood outside as a lookout" after he (Bulls) and Matthews went inside. Thus, Bulls's statement directly contradicted Petitioner's defense that he walked away and abandoned the robbery before Bulls and Matthews entered Mr. Johnson's house.

The Confrontation Clause of the Sixth Amendment to the United States Constitution provides that, "[i]n all criminal prosecutions, the accused shall enjoy the right ... to be confronted with the witnesses against him...." U.S. Const. amend. VI. In *Bruton v. United States*, 391 U.S. 123, 126, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968), the United States Supreme Court held that admission of a non-testifying co-defendant's confession at a joint trial violates the petitioner's right of confrontation even when the jury is instructed that the co-defendant's confession may not be used to determine the petitioner's guilt or innocence. There was no such cautionary instruction in this case.

■ The Supreme Court has subsequently held that an accomplice's confession which inculpates a defendant is presumptively unreliable and can be admitted as substantive evidence of the defendant's guilt only if it falls within a firmly rooted hearsay exception or is supported by a showing of particularized guarantees of trustworthiness. *See Lee v. Illinois*, 476 U.S. 530, 543–44, 106 S.Ct. 2056, 90 L.Ed.2d 514 (1986) (citing *Ohio v. Roberts*, 448 U.S. 56, 100 S.Ct. 2531, 65 L.Ed.2d 597 (1980)). The constitutional right of confrontation has been interpreted as a right to subject the testimony of witnesses against the defendant to adversarial cross-examination. The law construing the Sixth Amendment right of confrontation and the evidentiary law of hearsay run along essentially parallel lines. A violation of one is generally, although not always, a violation of the other.

However, some types of statements, and some statements uttered in particular, well-defined contexts, usually those understood in federal evidentiary law to be within a codified exception to the hearsay rule or those labeled "not hearsay," are judged to be sufficiently reliable to permit the government to introduce them as evidence against a defendant without the right to subject them to cross-examination. Specifically, the Supreme Court has ruled that out-of-court declarations that are, by definition, "hearsay" are nevertheless admissible where the declarant is unavailable to testify at trial, providing the hearsay statements bear "adequate 'indicia of reliability.'" *Ohio v. Roberts*, 448 U.S. 56, 66, 100 S.Ct. 2531, 65 L.Ed.2d 597 (1980).

> Reliability can be inferred without more in a case where the evidence falls within a firmly rooted hearsay exception. In other cases, the evidence must be excluded, at least absent a showing of particularized guarantees of trustworthiness.

*Id.*

In *Lilly v. Virginia*, 527 U.S. 116, 134, 119 S.Ct. 1887, 1897, 144 L.Ed.2d 117 (1999), the Supreme Court held "that accomplices' confessions that inculpate a criminal defendant are not within a firmly rooted exception to the hearsay rule as that concept has been defined in our Confrontation Clause jurisprudence." Thus, the fact that a statement is against the penal interest of the declarant does not in itself provide a basis for its admission against another defendant.[6] This does not

---

6. Respondent argues that Petitioner is not entitled to benefit from the holding in *Lilly* that a statement against a nontestifying declarant's penal interest is not admissible as a firmly rooted hearsay exception, because the

Michigan Court of Appeals rendered its decision on Petitioner's appeal before the United States Supreme Court decided *Lilly*. Respondent cites *Teague v. Lane*, 489 U.S. 288, 109

mean that the Confrontation Clause bans all use of nontestifying accomplice statements that incriminate a defendant. "Rather, it simply means that the government must satisfy the second prong of the *Ohio v. Roberts* [ ] test in order to introduce such statements." *Lilly*, 527 U.S. at 134, n. 5, 119 S.Ct. 1887. The "particularized guarantees of trustworthiness" must be inherent in the circumstances of the testimony itself; the fact that other evidence corroborates the testimony in question is insufficient. *Lilly*, 527 U.S. at 136–37, 119 S.Ct. 1887. The *Lilly* court addressed the standard for determining whether particularized guarantees of trustworthiness are sufficiently strong for the Constitution to permit without cross-examination the admission of a nontestifying accomplice's confession which incriminates a defendant as follows:

> When a court can be confident—as in the context of hearsay falling within a firmly rooted exception—that "the declarant's truthfulness is so clear form the surrounding circumstances that the test of cross-examination would be of marginal utility," the Sixth Amend-

ment's residual "trustworthiness" test allows the admission of the declarant's statements.

*Lilly*, 527 U.S. at 136, 119 S.Ct. 1887 (quoting *Idaho v. Wright*, 497 U.S. 805, 817, 110 S.Ct. 3139, 111 L.Ed.2d 638 (1990)).

In *Lee*, the trial court admitted two co-defendants' pre-trial statements, implicating themselves and each other, into evidence during their joint murder trial. The statements overlapped to a great extent, but differed as to petitioner Lee's planning of one death, her facilitation of another death, and the factual circumstances relevant to premeditation. The Supreme Court determined that the confessions did not have a sufficient "indicia of reliability" based upon the circumstances in which they were given or their "interlocking" nature to satisfy Confrontation Clause concerns. The Supreme Court explained:

> The subjects upon which these two confessions do not 'interlock' cannot in any way be characterized as irrelevant or trivial. The discrepancies between the two go to the very issues in dispute at trial: the roles played by the two defen-

S.Ct. 1060, 103 L.Ed.2d 334 (1989), for support. This Court disagrees. It is not necessary to determine whether *Lilly* is retroactive under *Teague v. Lane*, because *Lilly* is not being applied in this instance to give the Petitioner the advantage of a new constitutional rule of criminal procedure. On the contrary, *Lilly* is relied upon merely to demonstrate that at the time of Petitioner's trial in 1997, the against penal interest exception to the hearsay rule had not been determined to be a "firmly rooted" exception under the mode of analysis established by *Ohio v. Roberts* in 1980, and, in fact, has now been so rejected as manifested by *Lilly*. It should also be remembered in this context that Petitioner had no burden to demonstrate anything; it was the burden of the State, as the proponent of the evidence, to show that the against penal interest exception to the hearsay rule was an acceptable reason to admit the evidence notwithstanding the Confrontation Clause. It

could not do so then and, even in the absence of *Lilly*, it can not do so now. In short, *Lilly* did not announce a new constitutional rule of criminal procedure benefitting defendants in criminal cases. Rather, *Lilly* declined to announce a rule at the behest of the state thereby leaving a defendant's rights under the Confrontation Clause as they were. *See also, Vincent v. Seabold*, 226 F.3d 681, 688–89 (6th Cir.2000)(writ granted; holding that admission of nontestifying former co-defendant's hearsay statements violated the Confrontation Clause, citing and relying upon the holding from *Lilly* that confessions that inculpate a criminal defendant are *not* within a firmly rooted exception to the hearsay rule for Confrontation Clause purposes, with no mention or discussion of retroactivity concerns where the petitioner was convicted in 1985 and his habeas petition was filed in 1997, about two years before *Lilly* was decided).

dants in the killing of Odessa, and the question of premeditation in the killing of Aunt Beedie.

\*　\*　\*　\*　\*　\*

We therefore hold on the record before us, there is no occasion to depart from the time-honored teaching that a co-defendant's confession inculpating the accused is inherently unreliable, and that convictions supported by such evidence violate the constitutional right of confrontation.

*Lee,* 476 U.S. at 546, 106 S.Ct. 2056.

In this case, it is undisputed that the trial court admitted co-defendant Bulls's un-redacted statements, which inculpated Petitioner, as evidence against Petitioner at trial, even though Bulls did not testify at trial and was not subject to cross-examination. The trial court admitted Bulls's statements under the penal interest exception to the Michigan hearsay rule, MRE 804(b)(3). The Michigan Court of Appeals affirmed this ruling, determining Bulls's statements implicating Petitioner fell under the penal interest exception and that his statements had "sufficient indicia of reliability to satisfy Confrontation Clause concerns." *People v. Hill,* No. 202849, 1998 WL 1989786, \*2 (Sept. 25, 1998).

Although the Michigan Court of Appeals did not engage in an extensive analysis of federal law, the Court's opinion indicates that it decided this issue as a matter of federal constitutional law. The Court of Appeals stated that a non-testifying co-defendant's statement must not violate the defendant's constitutional right to confront his accuser to be admissible against the defendant, cited *Ohio v. Roberts,* 448 U.S. 56, 66, 100 S.Ct. 2531, 65 L.Ed.2d 597 (1980) (hearsay statement of a non-testifying witness may be admissible if it falls within a firmly rooted exception to the hearsay rules, or if it presents particularized guarantees of trustworthiness), and concluded that the admission of Bulls's

statements as substantive evidence against Petitioner did not violate Petitioner's rights under the Confrontation Clause. *People v. Hill,* No. 202849, 1998 WL 1989786, \*2 (Sept. 25, 1998).

Accordingly, the issue before this Court is whether the Michigan Court of Appeals' decision that admission of Bull's statements did not violate Petitioner's Confrontation Clause rights constitutes a reasonable application of federal law. Having reviewed the matter, the Court concludes that the Michigan Court of Appeals' determination in this regard is objectively unreasonable. The Court of Appeals found that, although Bulls's statements were made during custodial interrogation, there was no indication that Bulls was motivated by a desire to curry favor with the authorities. Further, the Court of Appeals found that Bulls's statements were voluntarily given, did not minimize his involvement in the crime, and were not motivated by a desire to lie or distort Petitioner's role in the crime. This Court finds that the Court of Appeals ruling that Bull's statements used against Petitioner had sufficient indicia of reliability to satisfy Confrontation Clause concerns is objectively unreasonable and contrary to United States Supreme Court precedent.

The Michigan Court of Appeals' ruling reveals a misunderstanding of Rule 804(b)(3) and the Constitution's related Confrontation Clause concerns. In the vast majority of instances in which Rule 804(b)(3) is relied upon, it is the defendant who relies upon the Rule to admit a statement, otherwise hearsay, which operates to exculpate him by inculpating the statement's declarant. *See, e.g., Chambers v. Mississippi,* 410 U.S. 284, 299–300, 93 S.Ct. 1038, 35 L.Ed.2d 297 (1973); *United States v. Price,* 134 F.3d 340 (6th Cir.), *cert. denied,* 525 U.S. 845, 119 S.Ct. 114, 142 L.Ed.2d 91 (1998); *United States v.*

*Paguio,* 114 F.3d 928 (9th Cir.1997). Under such circumstances, the out-of-court statement is marked by significant intrinsic indicia of reliability: a reasonable person who was not guilty of a crime would not normally falsely inculpate himself for the purpose of falsely exculpating another. However, where, as here, it is the prosecution which seeks to introduce a statement, otherwise hearsay, which incriminates its declarant but which, in its detail, also incriminates the defendant by spreading or shifting onto him some, much, or all of the blame, the out-of-court statement entirely lacks such indicia of reliability as to the defendant. It is ordinary hearsay as to the defendant and it does not lose that character merely because it in addition reliably inculpates the declarant. Indeed, an alleged coconspirator in the custody of law enforcement officials will generally have a salient and compelling interest in incriminating other persons, both to reduce the degree of his own apparent responsibility and to obtain lenience in sentencing. Even if the declarant does not actually have a realistic possibility of mitigating his legal situation by incriminating another person (or persons), he or she is likely to believe that this is the case. This is particularly true where, as here, the declarant offers a statement while in police custody without benefit of counsel. The courts can not pretend to be unaware of these practical and psychological facts when assessing the inherent trustworthiness, or lack thereof, of such statements.

The ordinary Rule 804(b)(3) statement against interest, by contrast, inculpates the declarant and either explicitly or implicitly exculpates the defendant on trial.

The Supreme Court has stated:

[The] truthfinding function of the Confrontation Clause is uniquely threatened when an accomplice's confession is sought to be introduced against a criminal defendant without the benefit of cross-examination. As has been noted, such a confession is hearsay, subject to all the dangers of inaccuracy which characterize hearsay generally.... More than this, however, the arrest statements of a codefendant have traditionally been viewed with special suspicion. Due to his strong motivation to implicate the defendant and to exonerate himself, a codefendant's statements about what the defendant said or did are less credible than ordinary hearsay evidence....

... [W]hen one person accuses another of a crime under circumstances in which the declarant stands to gain by inculpating another, the accusation is presumptively suspect and must be subjected to the scrutiny of cross-examination.

*Lee,* 476 U.S. at 541, 106 S.Ct. 2056 (internal quotation marks and citations omitted).

"For these reasons, it is clear that Supreme Court Confrontation Clause jurisprudence does not permit the introduction of hearsay declarations uttered by accomplices in law enforcement custody that inculpate a defendant, absent further 'particularized guarantees' of the declaration's trustworthiness." *United States v. McCleskey,* 228 F.3d 640, 644 (6th Cir. 2000). The question then is whether Bulls's statement incriminating both himself and Petitioner and Matthews bears guarantees of trustworthiness sufficient to rebut its presumptive unreliability. Although some details of Bulls's confession were borne out at trial and were not contradicted by Petitioner's statements, the Supreme Court has unambiguously held that "[t]o be admissible under the Confrontation Clause, hearsay evidence used to convict a defendant must possess indicia of reliability by virtue of its inherent trustworthiness, not by reference to other evidence at trial." *Idaho v. Wright,* 497 U.S. at 822, 110 S.Ct. 3139. Thus, we must look to the statement itself and to the circum-

stances of its delivery for evidence of its inherent reliability.

■ The declarant Bulls had been advised of his Miranda rights; his confession was voluntary for Fifth Amendment purposes; he was aware that he was exposing himself to criminal liability; and there was no express promise of leniency in exchange for his cooperation. While these factors are strong indicators that Bulls's statement was voluntary and therefore presumptively reliable as to himself, they offer no basis for finding the necessary circumstantial guarantees of trustworthiness as to the portion inculpating Petitioner. It must be noted that, while Bulls did not attempt to shift blame from himself to Petitioner in his statement, he manifestly attempted to shift blame from himself to Matthews, while attempting to share blame with Petitioner. Bulls's statement spreading some blame to Petitioner by characterizing him as the lookout must be understood in this context; taken as a whole, Bulls's statement clearly attempted to shift the blame for Mr. Johnson's death from himself. Bulls had a strong interest in shifting at least some of the responsibility from himself and onto Petitioner and Matthews. Because of the psychological and potential legal incentive brought to bear upon an accomplice to shift and spread blame to other persons, such a confession given to police while in custody cannot be said to be "[a] statement which . . . so far tended to subject the declarant to . . . criminal liability . . . that a reasonable person in the declarant's position would not have made the statement unless believing it to be true." Mich. R. Evid. 804(b)(3). "[T]hat a person is making a broadly self-inculpatory confession does not make more credible the confession's non-self-inculpatory parts." *Lilly,* 527 U.S. at 139, 119 S.Ct. 1887 (quoting *Williamson v. United States,* 512 U.S. 594, 599, 114 S.Ct. 2431, 129 L.Ed.2d 476 (1994). Further, finding that such a confession possesses sufficient particularized guarantees of trustworthiness to allow its admission under the Confrontation Clause is objectively unreasonable and contrary to Supreme Court precedent.

This conclusion is reinforced by subjecting Bulls's statement to the trustworthiness test reiterated in *Lilly:*

> When a court can be confident . . . that the declarant's truthfulness is so clear from the surrounding circumstances that the test of cross-examination would be of marginal utility, the Sixth Amendment's residual trustworthiness test allows admission of the declarant's statements.

*Lilly,* 527 U.S. at 136, 119 S.Ct. 1887 (internal quotations and citation omitted).

In the present case, Petitioner confessed that he initially intended to participate in the robbery of Mr. Johnson with Jabbar Bulls and Deonte Matthews. However, Petitioner never admitted acting as the lookout for the robbers who went inside. On the contrary, Petitioner stated that he changed his mind about participating in the robbery and walked away some time *before* Bulls and Matthews went inside Mr. Johnson's home.[7] Admitting Bulls's state-

---

7. As noted, Petitioner made at least four statements to the police. In the first three, he said that he walked away from the victim's home before going up the driveway leading to the home. In his fourth or final statement, Petitioner admitted going to the back of the victim's home and hearing Jabbar Bulls open a front screen door and converse with the victim. Petitioner did not admit acting as a lookout, or remaining near the victim's home when Bulls and Matthews went inside, even in his last statement. See, Trial Transcript Volume IV at 585–615 (testimony of Sergeant Warren before the jury, indicating there were four statements) and Trial Transcript Volume IV at 557–567 (offer-of-proof testimony of Sergeant Warren given out of the presence of the jury, indicating there may have been five statements).

ment allowed the prosecution to have Bulls "tell" the jury that Petitioner acted as the lookout after he and Matthews went inside, without subjecting this assertion to cross-examination. That is, Bulls's statement provided evidence that Petitioner did not abandon his participation in the robbery. Yet Bulls admitted that he and Matthews went inside without Petitioner and then immediately accosted Mr. Johnson and began searching his house for valuables to steal. This Court is not persuaded that it would have been of "marginal utility" for Petitioner to have cross-examined Bulls as to how he knew that Petitioner acted as the lookout when he (Bulls) admitted going in the house with Matthews and immediately became involved in the assault, robbery, and shooting.

Under such circumstances, Bulls's statements cannot be deemed to have "particularized guarantees of trustworthiness" as discussed in *Lee* and *Lilly, supra.* Petitioner has thus established that the trial court violated his Confrontation, Clause rights by admitting co-defendant Bulls's unredacted statements as substantive evidence of Petitioner's guilt and that the Michigan Court of Appeals decision to the contrary is objectively unreasonable.

■ The remaining, critical issue for this Court to decide is whether or not the trial court's Confrontation Clause error should be deemed harmless. For purposes of federal habeas review, a constitutional error that implicates trial procedures is considered harmless if it did not have a "substantial and injurious effect or influence in determining the jury's verdict." *Brecht v. Abrahamson,* 507 U.S. 619, 637, 113 S.Ct. 1710, 123 L.Ed.2d 353 (1993); *Gilliam v. Mitchell,* 179 F.3d 990, 995 (6th Cir.1999) (holding that the harmless error standard announced in *Brecht* applies even if a federal habeas court is the first to review for harmless error); *see also O'Neal v. McAninch,* 513 U.S. 432,

445, 115 S.Ct. 992, 130 L.Ed.2d 947 (1995) (habeas court should grant petition if it has "grave doubt" about whether trial error had substantial and injurious effect or influence upon jury's verdict).

In this case, the Michigan Court of Appeals concluded that the trial court's admission of Bulls's statement against Petitioner was not a violation of Petitioner's Confrontation Clause rights. Therefore, the Michigan Court of Appeals did not conduct a harmless error analysis.

■ Respondent maintains that "it is certain that Bulls' statement did not have a substantial and injurious effect on the jury's verdict. Bulls' statement completely mirrors, in relevant aspects, Hill's own statement about his participation in the robbery and subsequent murder.... In addition, Bulls' statement did nothing to detract from Hill's defense. Hill argued that, after Bulls and D–Mack entered the house, he abandoned the scheme. Bulls' statement did nothing to detract from that defense. It never placed Petitioner in the house or involved him in the subsequent murder and flight from the scene." Respondent's Answer at 29. Upon review of the record, this Court must disagree.

Bulls's statement says that "T–Mack" (Petitioner) "stayed like on the side of the house" while Bulls knocked on the door and Matthews rushed and pointed the shotgun in the victim's face. Continuing, after stating that the victim screamed "don't shoot me" and that he (Bulls) and Matthews went inside, Bulls stated that Petitioner "stood outside as a look-out." Respondent's Brief at 9–10; Trial Transcript Volume IV at 589–600. Petitioner's statements asserted that he left the area before Bulls and Matthews entered the house. Petitioner initially stated that he left the area before walking up the driveway to the house. His last statement indicated that he was at the back of the vic-

tim's house as Bulls and Matthews were at the front door. Thus, it is not the case that Bulls's statements mirrored Petitioner's and that Bulls's statement did not weaken Petitioner's defense. On the contrary, Bulls's statement directly contradicted Petitioner's statements (including Petitioner's last, most self-incriminating, statement), concerning whether or when Petitioner may have abandoned the criminal scheme to rob Jermaine Johnson before Bulls and Matthews went inside.

 Where a violation of a criminal defendant's right of confrontation has occurred, that violation is subject to a harmless error analysis. *Delaware v. Van Arsdall*, 475 U.S. 673, 684, 106 S.Ct. 1431, 89 L.Ed.2d 674 (1986)(concerning restrictions on cross-examination). The factors to be examined in determining whether harmless error has occurred with respect to a violation of the right of confrontation include: "the importance of the witness' testimony in the prosecution's case, whether the testimony was cumulative, the presence or absence of evidence corroborating or contradicting the testimony of the witness on material points, [ ] and, of course, the overall strength of the prosecution's case." *Id.; see also, Idaho v. Wright*, 497 U.S. at 822, 110 S.Ct. 3139 (suggesting that the presence of corroborating evidence may "more appropriately indicate[ ] that any error in admitting the statement might be harmless, rather than that any basis for presuming the declarant to be trustworthy").

 The question in the present case is whether the trial court's error in admitting Jabbar Bulls's statements as substantive evidence of Petitioner's guilt was harmless. In *O'Neal v. McAninch*, 513 U.S. at 436, 115 S.Ct. 992, the United States Supreme Court held that when a federal court judge in a habeas proceeding is in grave doubt about whether a trial error of federal constitutional law had a substantial and injurious effect or influence in determining the jury's verdict, the error is not harmless and the petitioner must win. The focus in such a situation is not merely whether there is enough evidence to support the result, apart from the phase affected by the error. It is, rather, even so, whether the error itself has substantial influence. If so, or a judge is left in grave doubt, the conviction cannot stand. *O'Neal*, 513 U.S. at 438, 115 S.Ct. 992. Only if a federal habeas court can say with certainty that a trial error had little or no impact on the judgment, should the judgment stand. *Barker v. Yukins*, 199 F.3d 867, 874 (6th Cir.1999); *cert. den. sub. nom. Yukins v. Barker*, 530 U.S. 1229, 120 S.Ct. 2658, 147 L.Ed.2d 273 (2000); *Fargo v. Phillips*, 129 F.Supp.2d 1075, 1085 (E.D.Mich.2001).

 Petitioner was convicted of assault with intent to rob and second-degree murder. The elements of assault with intent to rob while armed are: (1) an assault; (2) an attempt to rob; and (3) being armed. *People v. Patskan*, 387 Mich. 701, 714, 199 N.W.2d 458 (1972). The elements of second-degree murder are "(1) a death, (2) caused by an act of the defendant, (3) with malice, and (4) without justification or excuse." *People v. Goecke*, 457 Mich. 442, 463–464, 579 N.W.2d 868 (1998). The element of malice has been defined as "the intent to kill, the intent to cause great bodily harm, or the intent to do an act in wanton and wilful disregard of the likelihood that the natural tendency of such behavior is to cause death or great bodily harm." *Id.* at 464, 579 N.W.2d 868. The requisite malice for second-degree murder can be inferred from evidence that the defendant "intentionally set in motion a force likely to cause death or great bodily harm." *People v. Mayhew*, 236 Mich.App. 112, 125, 600 N.W.2d 370 (1999), quoting

*People v. Djordjevic,* 230 Mich.App. 459, 462, 584 N.W.2d 610 (1998).

 In his statements to the police, Petitioner contended that he abandoned the robbery enterprise before Mr. Johnson was assaulted and before he was shot to death. Abandonment of the criminal enterprise before the elements of the charged crime are committed is recognized as a defense under Michigan law. *People v. Kimball,* 109 Mich.App. 273, 283–88, 311 N.W.2d 343 (1981)(quoting the Michigan Second Revised Criminal Code, (Final Draft, 1979), s 1001(3), p. 94, as stating: "It is an affirmative defense to a prosecution under this section that, under circumstances manifesting a voluntary and complete renunciation of his criminal purpose, the actor avoided the commission of the offense attempted by abandoning his criminal effort and, if mere abandonment is insufficient to accomplish this avoidance, that the actor took further and affirmative steps that prevented the commission thereof.")

This Court cannot say with certainty that the trial court's error in admitting Bulls's statements as evidence of Petitioner's guilt had little or no impact on the jury's decision. On the contrary, this Court is persuaded that there is a substantial probability that Bulls's statement had a substantial and injurious effect on the jury's verdict. This conclusion is buttressed by the compromise verdict of second degree murder reached by Petitioner's jury.

All of Petitioner's statements asserted that he abandoned the robbery at some point before Bulls and Matthews entered the victim's home. It is true that Petitioner's last statement admitted being around the victim's back door at about the time that Bulls and Matthews must have been entering the house. It is also true that Petitioner's last statement contradicted his prior statements in this regard, potentially weakening his credibility. Nonetheless, no physical evidence tied Petitioner to the crime. No eyewitnesses were able to identify him as having fled the scene after the victim was shot. Mekia Randle, who testified that Jabbar Bulls and Deonte Matthews were involved in the robbery scheme and the killing of Jermaine Johnson, did not identify Petitioner as one of the perpetrators. In sum, it cannot be said that the evidence of Petitioner's guilt was overwhelming.

Given *Brecht, McAninch, Barker* and the circumstances of Petitioner's trial, this Court is left with grave doubt as to whether the unconstitutional admission of Jabbar Bulls's statements as evidence of Petitioner's substantive guilt had a substantial and injurious effect or influence on Petitioner's jury. Petitioner is therefore entitled to habeas relief on his Confrontation Clause claim.

## V. *Conclusion*

For the reasons stated, this Court concludes that Petitioner is entitled to federal habeas relief on his claim that his Confrontation Clause rights were violated at trial and that the resulting error was not harmless beyond a reasonable doubt.

Accordingly,

**IT IS ORDERED** that the petition for a writ of habeas corpus is **CONDITIONALLY GRANTED.** The State must retry Petitioner or release him from custody within 120 days of the date of this order. If the State fails to take such action, this Court shall consider the issuance of an additional writ unconditionally releasing Petitioner from state custody. Should the State appeal this decision to the United States Court of Appeals for the Sixth Circuit, this order is stayed pending the disposition of that appeal.

### JUDGMENT

The above entitled matter having come before the Court on a Petition for Writ of Habeas Corpus, Honorable Arthur J. Tarnow, a United States District Judge, presiding, and in accordance with the Opinion and Order entered on November 1, 2001.

**IT IS ORDERED AND ADJUDGED** that the Petition for Writ of Habeas Corpus be, and the same hereby is, **CONDITIONALLY GRANTED.**