*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206

ELECTRONIC CITATION: 2003 FED App. 0253P (6th Cir.)
File Name: 03a0253p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

———————

TERRANCE LESEAN HILL,
　　　*Petitioner-Appellee,*

　　*v.*　　　　　　　　　　No. 01-2667

GERALD HOFBAUER, Warden,
　　*Respondent-Appellant.*

———————

Appeal from the United States District Court
for the Eastern District of Michigan at Detroit.
No. 00-70960—Arthur J. Tarnow, District Judge.

Argued: May 6, 2003

Decided and Filed: July 28, 2003

Before: SUHRHEINRICH and GILMAN, Circuit Judges;
CARR, District Judge.[*]

———————

## COUNSEL

**ARGUED:** Laura Graves Moody, OFFICE OF THE
ATTORNEY GENERAL, Lansing, Michigan, for Appellant.

———

[*] The Honorable James G. Carr, United States District Judge for the
Northern District of Ohio, sitting by designation.

---

Corbett E. O'Meara, O'MEARA & O'MEARA, Grosse
Pointe Farms, Michigan, for Appellee. **ON BRIEF:** Laura
Graves Moody, OFFICE OF THE ATTORNEY GENERAL,
Lansing, Michigan, for Appellant.　Corbett E. O'Meara,
O'MEARA & O'MEARA, Grosse Pointe Farms, Michigan,
for Appellee.

———————

## OPINION

———————

SUHRHEINRICH, Circuit Judge.　Respondent-Appellant
Gerald Hofbauer, in his official capacity as Warden of the
Marquette Correctional Facility in Marquette, Michigan ("the
State"), appeals from the district court's conditional grant of
a writ of habeas corpus under 28 U.S.C. § 2254, as amended
by the Anti-Terrorism and Effective Death Penalty Act of
1996 (AEDPA), in favor of Petitioner-Appellee Terrance
Lesean Hill.

The district court found that the state trial court denied Hill
his Sixth Amendment Confrontation Clause rights.
Specifically, the district court found that the Michigan court
erred by allowing into evidence a statement made by Hill's
non-testifying co-defendant.　The State claims on appeal that
the writ should not have been granted because the state
court's admission of the co-defendant's statement was not
"contrary to," or an "unreasonable application" of, "clearly
established Federal law."　The State asserts that *Ohio v.
Roberts*, 448 U.S. 56 (1980), provides for the admission of
hearsay statements where the statements contain significant
indicia of reliability.　The State argues that the co-defendant's
statement is reliable because it was made against the
declarant's penal interest.

We reject the State's arguments and affirm the grant of the
writ.　We find that the trial court's admission of the co-
defendant's statement over Hill's objection was contrary to

the precedent clearly established by the Supreme Court in *Lee v. Illinois*, 476 U.S. 530 (1986); *Bruton v. United States*, 391 U.S. 123 (1968); and *Douglas v. Alabama*, 380 U.S. 415 (1965). We also find the error not harmless because the co-defendant's statement indicates that Hill possessed the requisite malice to be guilty of second-degree murder.

## I.

Hill's petition for a writ of habeas corpus arises from his arrest and conviction following the robbery and murder of Jermaine Johnson on August 24, 1995. On that date, Johnson was shot and killed inside his residence in Flint, Michigan by then-unknown assailants.

Sometime in 1996, Mekia Randle informed Flint police that her ex-boyfriend, Jabbar Priest Bulls, had told her he had participated in Johnson's murder. Randle gave recorded statements to the police describing Bulls' role in the murder. Flint police arrested Bulls and confronted him with Randle's tape-recorded statements. Bulls gave a statement confessing to the crime, and inculpating Hill and another co-defendant, Deonte Matthews, as well. Hill and Matthews were subsequently arrested.

In his statement, Bulls gave his account of the events surrounding Johnson's murder. He stated that on August 24, 1995, Johnson approached him on the street and offered him money in exchange for allowing Johnson to perform oral sex on him. Bulls verbally accepted the offer and accompanied Johnson to Johnson's home. Bulls claimed he had no interest in Johnson's sexual advances, but he accompanied Johnson because he thought "[t]hat [he] could beat him up and take his money." Upon arriving at Johnson's home, Bulls quickly excused himself but promised to return. After he left Johnson's house, Bulls went to Matthews' house to recruit Matthews and Hill to aid him in robbing Johnson. Specifically, Bulls stated "I told [Matthews] about the fag around the corner; and I told him we could go and rob him

real quick [sic] and get paid. I told him we could go and stick up the fag; and after I told him that, then I told [Hill]." Moreover, Bulls asked Matthews to bring a gun. In response, Matthews went upstairs and retrieved a shotgun. Bulls stated that Hill also agreed to the plan to rob Johnson, and the three men left Matthews' house, walking together. At Johnson's house, Bulls went to the back door, while Hill "stayed . . . on the side of the house, and [Matthews] . . . was on the other side of the door. And when [Bulls] knocked on the door, [Johnson] opened the door. And as soon as [Johnson] opened the door, [Matthews] rushed and he pointed the shotgun in his face." Only Bulls and Matthews entered Johnson's house, while Hill "[s]tood outside as a lookout." As Bulls and Matthews were rummaging through the house, Johnson attempted to flee, and then Bulls "heard a blast." Matthews had shot Johnson, killing him. Immediately, Bulls asked Matthews why he had shot Johnson, to which Matthews responded: "He tried to run." Bulls then sprinted down the steps, exited the house, and ran to Randle's house.

After his arrest, Hill also gave a statement to police, likewise giving his account of the events. He stated that Bulls came to him to solicit his help in robbing Johnson. Bulls proposed a plan, under which he expected Hill to stand outside and "[w]ait for [Bulls] to let [him] inside the house [to] take . . . items from the house." Hill initially agreed to do so. As Hill and Bulls were walking toward Johnson's house, Matthews met the two of them and then subsequently left. Bulls told Hill that Matthews was leaving to get a gun because "it would be easier for him to rob" Johnson. Matthews returned, but was not visibly carrying a weapon. Upon reaching Johnson's house, Hill followed Bulls and Matthews up the driveway, went behind the house, and listened while Bulls and Matthews stood at the back door. Hill stated that, at this time, he "didn't have [his] mind made up" whether he was going to enter the house. Bulls knocked on the door, and had a brief conversation with the resident, presumably Johnson. At this time, Hill decided to abandon

the plot and left. He said he heard a shot as he was walking away.

Subsequently, neighbors apparently saw some men running from the house, and described a person who resembled Hill. The Flint police stopped and questioned Hill later that night, but initially determined he was not involved and released him.

In 1997, Hill and Bulls were tried together in Genessee County, Michigan, Circuit Court.[1] During the trial, neither defendant testified. However, both Hill's and Bulls' statements were entered into evidence. Hill was convicted of second-degree murder under Mich. Comp. Laws § 750.317; and assault with intent to rob while armed under Mich. Comp. Laws § 750.89. Hill received a sentence of life imprisonment for the murder charge, and fifteen to thirty years' imprisonment for the assault charge. He appealed to the Michigan Court of Appeals, claiming, *inter alia*, that his Sixth Amendment Confrontation Clause rights were violated by the introduction of Bulls' statements. On September 25, 1998, the court affirmed Hill's convictions and sentence. *People v. Bulls*, Nos. 202149 & 202849, 1998 WL 1989786 (Mich. App. Sept. 25, 1998) (per curiam) ("*State Appeal*"). The Michigan Supreme Court denied Hill's application for leave to appeal on June 29, 1999. *People v. Bulls*, 598 N.W.2d 341 (Mich. 1999).

Pursuant to 28 U.S.C. § 2254, Hill filed a petition for a writ of habeas corpus with the district court. The court conditionally granted the petition on November 1, 2001. *Hill v. Hofbauer*, 195 F. Supp.2d 871 (E.D. Mich. 2001) ("*Hill I*"). On November 27, 2001, the State filed a notice of appeal with

---

[1]Deonte Matthews, the purported trigger man, was arrested and charged, but never brought to trial. The state dismissed Matthews' charges because the only evidence against him was the statements of Hill and Bulls. *See Hill v. Hofbauer*, 195 F.Supp.2d 871, 875 n.3 (E.D. Mich. 2001) ("*Hill I*").

this Court. This appeal is timely under Fed. R. App. P. 4(b)(1)(B).

Bulls was also found guilty at his joint trial with Hill. In his case, the Michigan Court of Appeals had ruled that the introduction of Hill's statement was a violation of Bulls' Sixth Amendment rights. *State Appeal*, 1998 WL 1989786, at *2. The Michigan court found that Hill's statement did not fit into the hearsay exception for statements against the declarant's penal interest because Hill, in his statement, had shifted most of the blame to Bulls. *Id.* at *2. However, the court found the error harmless because Bulls had admitted that he knew Matthews was carrying a shotgun, and the jury could therefore infer Bulls' malice from his own statement. *Id.* Bulls filed a habeas petition and challenged the harmless error ruling in the district court below. The district court found the error not harmless and granted the writ. *Bulls v. Jones*, 86 F.Supp. 2d 746, 754 (E.D.Mich. 2000). We affirmed, finding the error not harmless because the admission of Hill's statement tended to show that Bulls knew there "was a high likelihood that Matthews would kill Johnson," more so than did Bulls' own statement. *Bulls v. Jones*, 274 F.3d 329, 336 (6th Cir. 2001).

## II.

We review a district court's legal conclusions in a habeas proceeding *de novo*, and its factual findings for clear error. *Vincent v. Seabold*, 226 F.3d 681, 684 (6th Cir. 2000).

Because Hill filed his petition in November 2001, his case is governed by 28 U.S.C. § 2254(d), as amended by the AEDPA of 1996. *See Vincent*, 226 F.3d at 684; *see also Lindh v. Murphy*, 521 U.S. 320, 326 (1997). Section 2254(d), as amended, provides that a petition for writ of habeas corpus shall fail before the district court unless the state trial court's decision:

(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

(2) resulted in a decision that was based upon an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

In *Williams v. Taylor*, 529 U.S. 362 (2000), the Supreme Court analyzed the AEDPA, and clarified what constitutes a decision "contrary to," or an "unreasonable application" of "clearly established" Supreme Court law. The "contrary to" and "unreasonable application" clauses of the AEDPA are independent tests and must be analyzed separately. *Id.* at 407. A state court decision can be "contrary to" Supreme Court case law in two ways. First, the decision is contrary if the state court arrives at a conclusion opposite to that reached by the Supreme Court on a question of law. Also, a decision is contrary if the state court considers facts that are materially indistinguishable from a relevant Supreme Court case and arrives at an opposite result. *Id.* at 405. A state court decision involves an "unreasonable application" of Supreme Court law if "the state court identifies the correct governing legal rules from the Court's cases but unreasonably applies it to the facts of the particular state prisoner's case." It is also an "unreasonable application" of Supreme Court precedent where a state court invokes a Supreme Court case and unreasonably extends its legal principle to a new context where it should not apply, or fails to extend it where it should apply. *Id.* at 407. Moreover, "clearly established Federal law, as determined by the Supreme Court of the United States" "refers to the holdings, as opposed to the dicta, of [the Supreme] Court's decisions as of the time of the relevant state-court decision." *Id.* at 412.

## III.

In *Ohio v. Roberts*, 448 U.S. 56 (1980), the Supreme Court held that a hearsay statement is nonetheless admissible against a defendant if it falls within a "firmly rooted" hearsay exception. The Court defined a "firmly rooted" exception as one that assures the court that there are "indicia of reliability which have been widely viewed as determinative of whether a statement may be placed before the jury though there is no confrontation of the declarant, and [that affords] 'the trier of fact a satisfactory basis for evaluating the truth of the prior statement.'" *Id.* at 65 (quoting *Mancusi v. Stubbs*, 408 U.S. 204, 213 (1972) (citations omitted)). Where the hearsay statement does not fall within a "firmly rooted" hearsay exception, it is admissible only upon a showing of other "particularized guarantees of trustworthiness." *Roberts*, 448 U.S. at 66.

In this case, the Michigan Court of Appeals recognized the existence of Hill's federal constitutional rights, and acknowledged *Roberts* as the leading case law in the area. *See State Appeal*, 1998 WL 1989786, at *1. Relying on *Roberts*, the court found that Bulls' statements were reliable because they fell within the "firmly rooted" hearsay exception for statements against penal interest.[2] Specifically, the court stated:

> Although Bulls made his statements concerning Hill
> while in custody, the record is devoid of any indication

---

[2] The Michigan Court of Appeals also relied on Mich. R. Evid. 804(b)(3) to determine that there exists a hearsay exception for statements against penal interest. *See State Appeal*, 1998 WL 1989786, at *2. Mich. R. Evid. 804(b)(3) provides that "[a] statement which was at the time of its making so far contrary to the declarant's pecuniary or proprietary interest, or so far tended to subject the declarant to civil or criminal liability . . . that a reasonable person in the declarant's position would not have made the statement unless believing it to be true" is not excluded under the hearsay rule if the declarant is unavailable to testify. *See also* Fed. R. Evid. 804(b)(3) (stating same).

that Bulls was motivated to make the statements by a desire to curry favor from the authorities. Further, Bulls' statements have several indicia of reliability in that they do not minimize his role or responsibility in the crime, they were voluntarily given, and they were not motivated by a desire to lie or distort the truth regarding Hill's involvement in the crime. Accordingly, we conclude that the carry-over portions of Bulls' statements implicating Hill fall within the penal interest exception to the hearsay rule and have sufficient indicia of reliability to satisfy Confrontation Clause concerns. Thus, the trial court did not err in admitting the statements against Hill.

*State Appeal*, 1998 WL 1989786, at *2.

Hill petitioned the district court below for a writ of habeas corpus. The district court determined that the Michigan court's decision was "objectively unreasonable and contrary to" *Lilly v. Virginia*, 527 U.S. 116 (1999), and *Lee v. Illinois*, 476 U.S. 530 (1986). *Hill I*, 195 F.Supp.2d at 881. The district court found that those cases stand for the proposition that "a co-defendant's confession inculpating the accused is inherently unreliable, and . . . convictions supported by such evidence violate the constitutional right of confrontation." *Id.* (quoting *Lee*, 476 U.S. at 546). Accordingly, the court held that Bulls' statements were outside any "firmly rooted" exception under *Roberts*. *Hill I*, 195 F.Supp.2d at 882. The district court continued its analysis, and independently examined Bulls' statement under the second prong of the *Roberts* test to determine whether it nonetheless bore "guarantees of trustworthiness" to justify its admission. *Id.* at 882-84. The district court found none and granted the writ. *Id.* at 884.

The State argues that the district court erred to the extent it relied on *Lilly*. The State contends that we should disregard *Lilly* in its entirety because that case was not decided until 1999, a year after Hill's conviction was affirmed by the Michigan Court of Appeals. The State asserts that, at the

time, the admission of Bulls' statement against Hill cannot have been "contrary to . . . clearly established Federal law, as determined by the Supreme Court of the United States," 28 U.S.C. § 2254(d)(1), because the Supreme Court had not yet decided the issue in *Lilly*.

The State is correct that any new law in *Lilly* cannot be considered under the AEDPA, but the State misreads, first, the district court opinion as relying solely on *Lilly*, and, second, *Lilly* as creating a new rule rather than stating one mandated from earlier precedent.[3]

---

[3]The district court partially rejected the State's argument that *Lilly* could not apply here, stating:

> *Lilly* is not being applied in this instance to give the petitioner the advantage of a new constitutional rule of criminal procedure. On the contrary, *Lilly* is relied upon merely to demonstrate that at the time of Petitioner's trial in 1997, the against penal interest exception to the hearsay rule had not been determined to be a "firmly rooted" exception under the mode of analysis established by *Ohio v. Roberts* in 1980, and, in fact, has now been so rejected as manifested by *Lilly*. It should also be remembered in this context that Petitioner had no burden to demonstrate anything; it was the burden of the State, as the proponent of the evidence, to show that the against penal interest exception to the hearsay rule was an acceptable reason to admit the evidence notwithstanding the Confrontation Clause. It could not do so then and, even in the absence of *Lilly*, it can not do so now.

*Hill I*, 195 F.Supp.2d at 880 n. 6. Accordingly, the district court placed the burden on the State to present Supreme Court case law allowing for the admission of Bulls' statement, rather than requiring Hill to present Supreme Court case law disallowing it. This is the wrong standard. At the federal stage, the habeas petitioner, not the State, has the burden of proving that the state courts were in error, not the other way around. Under the AEDPA, a writ is properly granted only if the petitioner can demonstrate that the Supreme Court has provided "clearly established" precedent deeming the trial court's actions unconstitutional. The Supreme Court's silence on a particular issue cannot constitute "clearly established" Federal law. Therefore, the district court erred in rejecting the State's argument that any new rule espoused in *Lilly* cannot be considered on habeas review. *See also Teague v. Lane*, 489 U.S. 288, 301 (1989) (prohibiting reliance on a case that "breaks new ground" after state

Although the decision in *Lilly* drove the district court's opinion, the court nonetheless cited the earlier Supreme Court cases of *Lee* and *Bruton v. United States*, 391 U.S. 123 (1968), to stand for the same proposition as *Lilly*, and to demonstrate that the principles espoused in *Lilly* were previously established. *See Hill I*, 195 F.Supp.2d at 879; *see also Teague v. Lane*, 489 U.S. 288, 301 (1989) (stating that, in regard to habeas cases, a subsequently decided case does not present new law if it is "dictated by precedent existing at the time the defendant's conviction became final").

In *Lilly*, a plurality unequivocally stated that confessions made by a co-defendant inculpating not only himself but his co-criminals are "inherently unreliable" and not within a "firmly rooted" hearsay exception for statements against penal interest. *Lilly*, 527 U.S. at 131. Accordingly, the Court ruled that under the framework discussed in *Roberts*, a co-defendant's custodial confession cannot be entered into evidence absent additional "guarantees of trustworthiness." The Court "distinguishe[d] accomplices' confessions that inculpate themselves and the accused as beyond a proper understanding of the against penal-interest exception because an accomplice often has a considerable interest in 'confessing and betraying his cocriminals.'" *Id.* at 131 (citing 5 J. Wigmore, EVIDENCE § 1477, at 358, n. 1 (J. Chadbourn rev. 1974)). The Court further distinguished the confessions of accomplices from the statements of co-conspirators made in furtherance of a conspiracy, which have traditionally been held trustworthy, because in the case of custodial confessions, the government is typically "involved in the statements' production." Therefore such statements do not bear the same indicia of reliability as is present in statements made of the declarant's own accord. *See id.* at 137.

Moreover, the Supreme Court expressly referenced past Supreme Court cases in achieving its result in *Lilly*, stating

court proceedings in habeas cases).

that "[i]t is clear that our cases *consistently* have viewed an accomplice's statements that shift or spread the blame to a criminal defendant as falling outside the realm of those 'hearsay exception[s] [that are] so trustworthy that adversarial testing can be expected to add little to [the statements'] reliability.'" *Id.* at 133 (quoting *White v. Illinois*, 502 U.S. 346, 357 (1992)) (emphasis added) (alterations in original); *see also Lilly, id.* at 131 (citing *Douglas v. Alabama*, 380 U.S. 415 (1965)).

In our opinion in Bulls' case, we spoke to whether *Lilly* was mandated by earlier precedent, and addressed substantially the same cases referenced by the *Lilly* Court:

The Sixth Amendment provides that "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him." That guarantee includes the right to cross-examine witnesses. *See Pointer v. Texas*, 380 U.S. 400, 404 (1965). The Supreme Court has repeatedly held that a non-testifying co-defendant's statements that implicate a defendant are presumptively unreliable and their admission violates the Confrontation Clause. *See Douglas v. Alabama*, 380 U.S. 415, 419 (1965); *see also Bruton v. United States*, 391 U.S. 123, 126 (1968) (holding that the admission of non-testifying co-defendant's confession incriminating defendant, even with jury instructions to consider confession only against the co-defendant, violates the Confrontation Clause). The Supreme Court has noted that since *Douglas*, it "has spoken with one voice in declaring presumptively unreliable accomplices' confessions that incriminate defendants." *Lee v. Illinois*, 476 U.S. 530, 541 (1986); *see also Lilly*, 527 U.S. at 131; *Cruz v. New York*, 481 U.S. 186, 193 (1987). To overcome this presumption of unreliability and introduce such statements into evidence, the prosecution must show that the statements bear "adequate indicia of reliability." *Roberts*, 448 U.S. at 66; *United States v. McCleskey*, 228 F.3d 640, 644 (6th Cir. 2000) ("[I]t is

clear that Supreme Court Confrontation Clause jurisprudence does not permit the introduction of hearsay declarations uttered by accomplices in law enforcement custody that inculpate a defendant, absent further 'particularized guarantees' of the declaration's trustworthiness.").

*Bulls v. Jones*, 274 F.3d 329, 333-34 (6th Cir. 2001). In *Bulls*, the State had conceded it was constitutional error for the trial court to enter Hill's statement against Bulls because Hill's statement shifted a greater portion of the blame to Bulls, and thus was not against Hill's penal interest. The only issue before us in *Bulls* was whether the error was harmless. Accordingly, our discussion in *Bulls* of whether the principles espoused in *Lilly* were previously clearly established was dicta.

Today, we squarely face the issue whether *Lilly* was pre-ordained by earlier clearly established Supreme Court law for the first time.[4] Therefore, we find it necessary to discuss the facts of the Supreme Court cases cited in *Lilly* and *Bulls* in further detail.

In *Douglas v. Alabama*, 380 U.S. 415 (1965), the Court found that a statement wherein a declarant places any blame at all on his co-defendant is unreliable and inadmissible hearsay. *Id.* at 419. In a joint trial, the prosecutor was not permitted to refresh the memory of the uncooperative declarant with his statement because it implicated the defendant as well as himself. The Court found that such use

---

[4] In another case, *United States v. McCleskey*, 228 F.3d 640 (6th Cir. 2000), we likewise held that a co-defendant's custodial confession does not fall within a "firmly rooted" hearsay exception. *Id.* at 643-45. However, *McCleskey* was not a habeas case, but a federal drug case. Therefore, our analysis was not bound by the strictures of the AEDPA. Accordingly, although we relied on the decision in *Lee*, we did not perform a thorough analysis of whether the principle was "clearly established" by the Supreme Court, as that term is used in the AEDPA.

would "plainly den[y the defendant] the right of cross-examination secured by the Confrontation Clause." *Id.*

In *Bruton v. United States*, 391 U.S. 123 (1968), a non-testifying co-defendant had made a statement inculpating not only himself but the defendant, George Bruton, as well. At a joint trial, prosecutors sought to enter the statement, which was admittedly hearsay, under the exception for the admissions of a party-opponent. The trial court admitted the statement against the declarant and instructed the jury that the statement could not be considered against Bruton. The Supreme Court ruled that the limiting instruction was not sufficient. The Court found that the Sixth Amendment right to cross-examination is absolute, and admission of the co-defendant's statement therefore violated Bruton's right to confront the evidence against him. There was no presumption of veracity in the statement because the credibility of such statements is "inevitably suspect." 391 U.S. at 136.

In *Lee v. Illinois*, 476 U.S. 530 (1986), the Court again held a co-defendant's confession not within a hearsay exception and inadmissible. There, Millie Lee's co-defendant, Edwin Thomas, gave a statement inculpating both himself and Lee in a plot to kill Lee's aunt. Notwithstanding that Thomas' statement was voluntary and also incriminated himself, the Court held the statement unreliable and stated:

> Although . . . the confession was found to be voluntary for Fifth Amendment purposes, such a finding does not bear on the question of whether the confession was also free from any desire, motive, or impulse Thomas may have had either to mitigate the appearance of his own culpability by spreading the blame or to overstate Lee's involvement in retaliation for [Lee] having implicated him in the murders.

*Id.* at 544. Moreover, the Court in *Lee* recognized even then that its rule was not new law, stating that "there is no occasion to depart from the *time-honored teaching* that a co-

defendant's confession inculpating the accused is inherently unreliable, and that convictions supported by such evidence violate the constitutional right of confrontation." *Id.* at 546 (emphasis added).

In *Cruz v. New York*, 481 U.S. 186 (1987), the defendant, Eulogio Cruz, sought to suppress his co-defendant's confession under *Bruton*. However, Cruz had also made a confession which mirrored his co-defendant's statement in all relevant aspects. The trial court admitted the co-defendant's confession against Cruz, finding it reliable because of the two statements' "interlocking" nature. *Cruz*, 481 U.S. at 189. The Supreme Court reversed, and held that the existence of Cruz's own corroborating confession did not automatically render the co-defendant's statement reliable, and its admission constituted Sixth Amendment error. *Id.* at 193. The Court held, however, that the defendant's corroborating confession could be used on appeal to determine whether the error was harmless. *Id.* at 194.

As the foregoing discussion indicates, the Supreme Court had provided a line of cases holding that a co-defendant's custodial confession is inherently unreliable. However, the State nonetheless contends that the *Lilly* rule cannot be said to have been previously "clearly established" by the Supreme Court because several federal circuits had held such statements admissible in the face of the above-cited Supreme Court precedent. Although only Supreme Court case law is relevant under the AEDPA in examining what Federal law is "clearly established," the decisions of the United States Courts of Appeals may be informative to the extent we have already reviewed and interpreted the relevant Supreme Court case law to determine whether a legal principle or right had been clearly established by the Supreme Court. *See, e.g.*, *O'Brien v. Dubois*, 145 F.3d 16, 25 (1st Cir. 1998), *overruled on other grounds*, *McCambridge v. Hall*, 303 F.3d 24, 36-37 (1st Cir. 2002) (en banc). Because we had examined this issue only in dicta, a review of other circuits' pre-*Lilly* case

law interpreting *Douglas*, *Bruton*, and *Lee* may be informative.

In *United States v. York*, 933 F.2d 1343 (7th Cir. 1991), the Seventh Circuit affirmed the admission of a co-conspirator's statement against the defendant at his insurance fraud trial. The co-conspirator, Gail Maher, had made statements to two associates claiming that she and the defendant, Tom York, had planned to blow up the lounge York owned in order to collect the insurance proceeds. *Id.* at 1360. Maher, having died, did not testify. The court affirmed the admission of Maher's statement, noting that it tended to subject her to such criminal liability that she would not have made the statement had it not been true. *Id.*

In *United States v. Seeley*, 892 F.2d 1 (1st Cir. 1989), authored by then-Circuit Judge Stephen Breyer, the First Circuit likewise upheld the admission of a co-conspirator's statement as against his penal interest. There, the defendant, Edward Seeley, was charged in connection with two Massachusetts bank robberies. A fellow bank robber, Robert Wayne, made statements to his girlfriend that inculpated himself, Seeley, and three other men in the bank heists. *Id.* at 1. Wayne was found dead a month after the robberies, and was therefore not charged in the crimes and unable to testify at Seeley's trial. The trial court allowed Wayne's girlfriend to testify to his statements, and the First Circuit upheld their admission, finding that the statements bore sufficient indicia of reliability because Wayne would not have made such statements to his girlfriend had they not been true. *Id.* at 4; *see also United States v. Fields*, 871 F.2d 188 (1st Cir. 1989) (affirming admission of Wayne's statements against another accomplice for same reasons).

In *United States v. Katsougrakis*, 715 F.2d 769 (2d Cir. 1983), one of the co-conspirators, Kyriakos Chrisanthou, was badly burned while setting fire to the defendant's restaurant, and subsequently died from his injuries. The trial court allowed Chrisanthou's wife and his friend, Fitos Vasilou, to

testify at Katsougrakis's fraud trial about statements that Chrisanthou had made to each of them implicating himself, as well as Katsougrakis and other co-conspirators, in a scheme to defraud Katsougrakis's insurers by setting fire to his business. The Second Circuit affirmed the admissions, finding sufficient indicia of reliability in Chrisanthou's statements because they were sufficiently against his penal interest. *Id.* at 775-76.

However, each of these circuit cases is distinguishable from the case *sub judice*.[5] The defendant in each case made his statement, not to police, but to an acquaintance or a fellow accomplice. Therefore, at the time of the statement, none of the defendants was motivated by a desire to curry the favor of law enforcement officials. *See, e.g.*, *Katsougrakis*, 715 F.2d at 775 (stating that Chrisanthou's statements bore adequate indicia of reliability only because they were made while "talking privately with his friend" and not to police). *Douglas*, *Bruton*, and *Lee* indicate that the Supreme Court has held statements made to police to closer scrutiny. Although Rule 804(b)(3) provides a hearsay exception for statements against the declarant's interest, this rule has been consistently

---

[5] The State also raises two Sixth Circuit cases to support its proposition that the Supreme Court had not previously clearly established the rule of *Lilly*. However, neither case is applicable here. In *Neuman v. Rivers*, 125 F.3d 315 (6th Cir. 1997), we held that statements against penal interest fell within a "firmly rooted" hearsay exception. But in that case, the admitted statement did not inculpate the declarant's accomplice, but only spoke to the declarant's role in the crime. *See id.* at 319-20. In *Gilliam v. Mitchell*, 179 F.3d 990 (6th Cir. 1999), we relied on *Neuman* and likewise held an accomplice's confession admissible. We did not, however, perform an analysis of whether the declarant's statement spoke only to his own role in the crime or inculpated his cohorts as well. Rather, in light of *Lilly* pending at the time in front of the Supreme Court, we gave only a cursory review of the "firmly rooted" exception issue, and rested our holding alternatively on two other grounds. *See id.* at 994 n. 1. First, we found that the declarant's statement contained additional particularized guarantees of trustworthiness. *Id.* at 994. And second, we found that any error was nonetheless harmless. *Id.* at 994-95.

disregarded by the Supreme Court in situations where the declarant's *custodial* confession at all implicates somebody else. Such statements are never truly against the declarant's penal interest because a defendant in custody always has a motivation to implicate and pass the blame to another, even if in the slightest. *See Lee*, 476 U.S. at 541. As the Supreme Court stated in *Williamson v. United States*, 512 U.S. 594, 599-600 (1994), such statements are inherently unreliable because "[o]ne of the most effective ways to lie is to mix falsehood with truth, especially truth that seems particularly persuasive because of its self-inculpatory nature."

Therefore, what was dicta in *Bulls* we make explicit today. We hold that *Douglas*, *Bruton*, and *Lee* evidence that the Supreme Court had clearly established the principle that a co-defendant's custodial confessions are unreliable and not within a "firmly rooted" hearsay exception prior to *Lilly*. Here, Bulls' custodial statements are no different than those statements held inadmissible in *Douglas*, *Bruton*, and *Lee*. We therefore conclude that the trial court's admission of Bulls' statement was "contrary to" the law of those indistinguishable Supreme Court cases.

We also hold that the trial court's admission of Bulls' statement was an "unreasonable application" of the legal principles espoused in *Roberts*, the only Supreme Court case identified by the state court of appeals. The Michigan court attempted to extend the list of "firmly rooted" hearsay exceptions to include a co-defendant's custodial confession inculpating his cohorts. In light of *Bruton* and the other above-cited Supreme Court precedent, we find this action objectively unreasonable under the "extension theory" of the "unreasonable application" standard of the AEDPA. *See Williams*, 529 U.S. at 407.

The State also argues that the district court erred in finding that Bulls' statement did not otherwise contain significant "guarantees of trustworthiness." However, the State has proposed no "guarantees of trustworthiness" beyond the fact

that Bulls' statement was a self-inculpatory confession. As stated above, this is insufficient to establish "significant indicia of reliability."

## IV.

Nonetheless, the trial error in this case is subject to harmless error analysis. *See Chapman v. California*, 386 U.S. 18, 24 (1967). On direct review, we employ a reasonable doubt standard to determine whether a constitutional error is harmless. *Id.* But a constitutional error is cause for federal habeas relief only if it has "a substantial and injurious effect or influence in determining the jury's verdict." *Brecht v. Abrahamson*, 507 U.S. 619, 623 (1993). The *Brecht* standard has survived the enactment of the AEDPA. We have held that if a petitioner can pass *Brecht* analysis, "he will surely have demonstrated that the state court's finding that the error was harmless beyond a reasonable doubt . . . resulted from an unreasonable application of *Chapman*." *See Nevers v. Killinger*, 169 F.3d 352, 371-72 (6th Cir. 1999); *see also Bulls*, 274 F.3d at 335. In determining whether Confrontation Clause error is harmless under *Chapman*, the reviewing court should consider: "the importance of the witness' testimony in the prosecution's case, whether the testimony was cumulative, the presence or absence of evidence corroborating or contradicting the testimony of the witness on material points, . . . and, of course, the overall strength of the prosecution's case." *Delaware v. van Arsdall*, 475 U.S. 673, 684 (1986); *cf. Idaho v. Wright*, 497 U.S. 805, 822 (1990) (stating that existence of corroborating evidence informs the question of harmless error). If the reviewing judge is in "grave doubt" about whether constitutional error is harmless, it is not. *O'Neal v. McAninch*, 513 U.S. 432, 445 (1995).

In determining whether the error in this particular case is harmless, we must decide whether the other evidence, including Hill's own statement, is overwhelming and sufficient to establish the elements of second-degree murder and armed assault with intent to rob beyond a reasonable

doubt. Otherwise, we must find that the introduction of Bulls' statement actually prejudiced Hill, had a "substantial and injurious effect" under *Brecht*, and was an "unreasonable application" of *Chapman*.

The State argues that "Bulls'[] statement completely mirrors, in relevant aspects, Hill's own statement about his participation in the robbery and subsequent murder," Brief for Appellant, at 37, and therefore its introduction was harmless error, if error at all. *Cf. Cruz*, 481 U.S. at 194 (holding error may be harmless where co-defendant's statement is duplicative of defendant's). The State is correct that Hill's statement is consistent with Bulls' in several respects. Hill indicated that he had originally agreed to the plan to rob Johnson, that he voluntarily went to Johnson's house, and that his role was to be a lookout and wait for Matthews and Bulls to return. However, Bulls' and Hill's statements are not entirely identical. Bulls stated that Hill and Matthews were together at Matthews' home when Bulls first approached them. This is significant because Bulls stated that Matthews retrieved a shotgun while all three men were together in Matthews' home, thereby implying that Hill was aware that Matthews had a gun.[6] By contrast, Hill stated that

---

[6] Bulls' statement went as follows:

Q: Did you ask [Matthews] if he had anything?
A: Yes.
Q: And what was that?
A: I asked him if he had a gun— some heat.
Q: And did he?
A: Yes.
Q: What kind?
A: Shotgun.
Q: Where did he get the shotgun from?
A: He went upstairs.
Q: Now you said you told [Hill] something.
A: Yes.
Q: What was that?
A: I told him the same thing that I told [Matthews] about the fag and robbing.

Bulls first approached Hill when Hill was alone, and that Matthews met Hill and Bulls later, as they were already walking toward the victim's house unarmed. Hill contended that Matthews and Bulls had a conversation, and Matthews subsequently left. Hill said Bulls told him that Matthews was leaving to get a gun. However, Hill claimed that when Matthews returned, he did not see Matthews carrying a gun. In fact, Hill unequivocally stated that he did not know Matthews had a gun.[7]

In order to find Hill guilty of second-degree murder in Michigan, the State must prove that there was: (1) a death; (2) caused by an act of the defendant; (3) with malice; and (4) without justification or excuse. *See People v. Goecke*, 579 N.W.2d 868, 878 (Mich. 1998). Moreover, under Michigan law, an aider and abettor can be charged as a principle if he "procures, counsels, aids, or abets" in the commission of the crime. *See* Mich. Comp. Laws Annot. § 767.39; *see also People v. Palmer*, 220 N.W.2d 393, 396-97 (Mich. 1974).

---

Q: So the three of you made a plan to go rob him?
A: Right.
Q: Did the three of you leave the house together?
A: Yes.
Q: Where did you go?
A: To the fag's house.
Q: How was the gun concealed as you walked there?
A: Matthews had it in his pants.

[7]Hill and the police had the following exchange concerning his knowledge that Matthews was carrying a gun:
Q: Did [Matthews] catch up with you?
A: Yes.
Q: Where at?
A: On Hamilton and Forest Hill.
Q: Did he have a weapon?
A: *Not that I know of, no.*
Q: You didn't see one?
A: No.
Q: Did you ask him if he had one?
A: No.

"Malice," in Michigan, is defined as "the intent to kill, the intent to cause great bodily harm, or the intent to do an act in wanton and wilful disregard of the likelihood that the natural tendency of such behavior is to cause death or great bodily harm." *Goecke*, 579 N.W.2d at 878-79. However, malice cannot be inferred from Hill's complicity in the robbery plot alone. *See People v. Aaron*, 299 N.W.2d 304, 326 (Mich. 1980) (stating that the commission of an underlying felony does not alone satisfy requirement of malice). Rather, a factual examination is necessary to determine whether Hill possessed an intent to kill or cause great bodily harm beyond his intent to rob. *See People v. Harris*, 476 N.W.2d 767, 771 (Mich. App. 1991); *see also People v. Kelly*, 378 N.W.2d 365, 381 (Mich. 1985).

Under an aiding and abetting theory, the State must prove either that Hill held the requisite intent for second-degree murder or had knowledge that Bulls and Matthews held that intent. *See People v. King*, 534 N.W.2d 534, 538 (Mich. App. 1995). An aider and abettor of a robbery must know of his cohort's intent to kill the victim, or at least his intent to physically harm the victim, before he can be found to have aided and abetted the murder as well. Such intent can be inferred from the aider and abettor's knowledge that his cohort possesses a weapon. *See, e.g.*, *People v. Feldmann*, 449 N.W.2d 692, 697 (Mich. App. 1989); *see also People v. Turner*, 540 N.W.2d 728, 733 (Mich. App. 1995), *overruled in part on other grounds*, *People v. Mass*, 628 N.W.2d 540, 548 (Mich. 2001). However, "[i]t is fundamentally unfair and in violation of basic principles of individual criminal culpability to hold one felon liable for an unforeseen death that did not result from actions agreed upon by the participants." *Turner*, 540 N.W.2d at 548.

Therefore, a determination of whether Hill knew that Matthews was carrying a gun is relevant to the jury's determination of whether Hill is guilty of second-degree murder. Hill's statement presents little question that he originally possessed the requisite intent to rob Johnson, but

leaves open whether he knew Matthews had a gun, and therefore whether Hill possessed the requisite malice necessary for second-degree murder. Bulls' statement removes any doubt by implying that Hill knew of the existence of the gun and acquiesced to its role in the robbery. Accordingly, Bulls' statement is more damaging to Hill than his own. We find, therefore, that the Sixth Amendment error had "a substantial and injurious effect or influence in determining the jury's verdict." *See Brecht*, 507 U.S. at 623. Hill is entitled to a new trial on both charges.[8]

## V.

For the foregoing reasons, we uphold the grant of the writ by the district court. The order by the district court to the State of Michigan to retry Hill or release him from penal custody within 120 days of the date of the district court order (November 1, 2001), plus time stayed pending this appeal, is hereby AFFIRMED.

---

[8] As one of its elements, the armed assault with intent to rob charge requires a finding that the perpetrator was armed with a dangerous weapon. Therefore, because Hill was charged under an aiding and abetting theory, whether Hill knew Matthews was armed is relevant to the analysis of this charge as well. *See* Mich. Comp. Laws § 750.89.