**Clarence SCOTT, Petitioner–Appellee,**

v.

**David GUNDY, Warden, Respondent–Appellant.**

**No. 03–1168.**

United States Court of Appeals, Sixth Circuit.

June 9, 2004.

David L. Parham, Richik Sarkar, Thompson Hine, Cleveland, OH, for Petitioner–Appellee.

Clarence Scott, East Lake, MI, pro se.

Thomas M. Chambers, Office of the Prosecuting Attorney, Detroit, MI, for Respondent–Appellant.

Before SUHRHEINRICH, GIBBONS and SUTTON, Circuit Judges.

SUTTON, Circuit Judge.

Clarence Scott filed a petition for a writ of habeas corpus challenging his state-court first-degree murder conviction, for which he currently is serving a life sen-

tence. He alleges that the admission of his co-defendant's confession, which implicated Scott in the murder, violated his rights under the Confrontation Clause. The district court agreed, holding that a constitutional violation occurred, that the error was not harmless under *Brecht v. Abrahamson.* 507 U.S. 619, 113 S.Ct. 1710, 123 L.Ed.2d 353 (1993), and that the writ should be granted conditionally. We affirm.

## I.

On April 2, 1994, Elwin Lilley drove to the Detroit airport to pick up his mother from an arriving plane. He arrived early and waited in his car in a parking lot adjacent to a McDonald's restaurant near the airport. While sitting in his car, he was shot and killed after what appears to have been a botched robbery attempt.

On May 4, 1994, the State of Michigan charged Clarence Scott and Isaac Collier with responsibility for the Lilley murder. A grand jury indicted Scott for (1) first-degree premeditated murder, (2) felony murder and (3) possession of a firearm during the commission of a felony. And a grand jury indicted Isaac Collier for (1) first-degree premeditated murder, (2) felony murder and (3) unarmed robbery.

In 1995, in the Recorder's Court of the City of Detroit, Michigan, the State tried Scott (also known as "Six–Nine") and Collier on each of these charges in a joint jury trial. Shortly before trial. Scott moved to sever the two mens' trials or at a minimum to empanel separate juries. The trial court rejected the motion.

Scott then moved to exclude a written confession given by Collier to police that implicated Scott in the shooting. On the morning of April 2nd, according to the confession. Collier and Scott borrowed a car from an acquaintance and drove toward the Detroit airport in search of a robbery prospect. After their first stop at a hotel proved unsuccessful, they drove to a nearby McDonald's. Once in the parking lot of the restaurant. Scott told Collier to back up next to one of the cars in the lot; after Collier did so, Scott got out of the car and "stuck the gun on the man [in the car] and told him to give him his money. The man resisted and he [Scott] started tapping the gun out at his face. Then [the victim] started the car and tried to drive off. Six–Nine shot him." JA 319—20.

Scott argued that the admission of Collier's statement would violate his rights under the Confrontation Clause. The court noted that Collier still intended to testify and thus would be available for cross-examination. When Scott countered that Collier could change his mind, JA 255 ("[I]f [the witness] is able to read the statement, then Mr. Collier at the last minute decides not to testify .... we can't unwring this thing."), the court responded that it would "take that up if Mr. Collier doesn't testify," JA 256. Collier indeed changed his mind, he did not testify and the court never reconsidered the Confrontation Clause issue even though the State was permitted to introduce Collier's statement through Sergeant Michael Ondejko. Neither the jury instructions nor any other guidance from the court limited the impact of the confession on the jury's deliberations.

Aside from Collier's confession, no other evidence at trial directly showed that Scott shot Lilley. Considerable circumstantial evidence, however, supported the State's theory of the case. Yolanda Pezzat, who was in her car at the McDonald's parking lot at the time of the shooting, came closest to observing what happened. She turned around just after hearing the gunshot and saw a man in a long trench coat,

whom she later identified as Scott, still pointing a gun of about a foot's length at the driver's side window of the victim's car. Other witnesses, after hearing the gunshot, saw the victim's car lurch forward and hit the McDonald's, then roll back into a black Ford Escort (consistent with the type of car that Collier and Scott had borrowed); they saw two black males, one of whom wore a long trench coat and whom they later identified as Scott, first unsuccessfully trying to push the victim's car off the Escort, then removing items from the two cars before fleeing. Other witnesses observed Scott in possession of a shotgun at various points on the day of the murder: Sue Rucker testified that she saw Scott with his sawed-off shotgun that morning, while Dean Patton saw Scott in the moments after the shooting placing the weapon in the waistband of his pants under his trench coat. And according to Michelle Swartz, Collier told her later that day that Scott had shot someone.

The jury convicted Scott of all three charges—first-degree premeditated murder, felony murder and possession of a firearm during the commission of a felony—and convicted Collier of felony murder. The trial court sentenced Scott to two years' imprisonment for the felony firearm conviction (which he has served) and to consecutive life sentences for the two murder convictions. On direct appeal, the Michigan Court of Appeals affirmed his premeditated murder conviction. The court rejected his Confrontation Clause challenge on two grounds—that Scott failed to renew his objection to the admission of the confession when Collier decided not to testify and that any constitutional error in admitting the confession was harmless. *People v. Collier*, Nos. 184478 & 184480, 1997 WL 33347912, at *6 (Mich. Ct.App. May 30, 1997). The appeals court vacated Scott's felony murder conviction, however, determining that his convictions

for "both felony murder and first-degree murder arising out of the same killing violate the protection against double jeopardy." *Id.* at *7. The Michigan Supreme Court denied leave to appeal. *People v. Scott*, No. 110092, 587 N.W.2d 635 (Mich. June 29, 1998). Today, Scott remains in prison solely as a result of his first-degree premeditated murder conviction.

On July 26, 1999, Scott filed a petition for a writ of habeas corpus in the United States District Court for the Eastern District of Michigan. His petition identified four theories of relief, only one of which remains in the case—the Confrontation Clause claim.

The district court rejected the State's argument that Scott had procedurally defaulted his Confrontation Clause claim by failing to renew his objection when Collier decided not to testify. It also held that the admission of the confession without an opportunity to cross-examine Collier constituted an unreasonable application of clearly-established federal law. *See* 28 U.S.C. § 2254(d)(1). The prejudice that results from the confession, the district court reasoned, "cannot be dispelled by cross-examination if the co-defendant does not take the stand." *Scott v. Bock*, 241 F.Supp.2d 780, 787 (E.D.Mich.2003) (quoting *Bruton v. United States*, 391 U.S. 123, 132, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968)) (internal quotation marks and citations omitted).

Turning to the impact of the error on the trial, the district court determined that it "likely had a substantial and injurious effect on the jury's verdict," *id.* at 792 (citing *Brecht v. Abrahamson*, 507 U.S. 619, 622, 113 S.Ct. 1710, 123 L.Ed.2d 353 (1993)), because the State's case relied on "circumstantial" evidence in the absence of the confession, *id.* In the district court's view, the confession provided "the only

direct evidence that: (1) Collier and the petitioner planned a robbery: (2) the petitioner ordered Collier to back up to Lilley's car; (3) the petitioner demanded money from Lilley while pointing a gun at him; (4) when Lilley resisted, the petitioner or Lilley tapped the gun; and (5) the petitioner shot the victim as he tried to drive away." *Id.* Because the confession "tied the evidence together and clinched the case for the prosecution," the court concluded, the constitutional error was not harmless. *Id.*

## II.

As this case comes to us, the scope of debate between the parties has narrowed considerably. The State concedes that the district court correctly rejected its procedural default argument because the state appellate court did not "clearly and expressly" rely on it in rejecting Scott's constitutional claim. *See Harris v. Reed,* 489 U.S. 255, 263, 109 S.Ct. 1038, 103 L.Ed.2d 308 (1989); *Frazier v. Huffman,* 343 F.3d 780, 791 (6th Cir.2003). The State also concedes that the district court correctly decided that the state court unreasonably applied the Supreme Court's precedents interpreting the Confrontation Clause—a concession made all the wiser by a recent decision of the Court. *See Crawford v. Washington,* —— U.S. ——, ——, 124 S.Ct. 1354, 1374, 158 L.Ed.2d 177 (2004) (holding that "[w]here testimonial evidence is at issue [ ] the Sixth Amendment demands . . . unavailability and a prior opportunity for cross-examination" and overruling *Ohio v. Roberts,* 448 U.S. 56, 100 S.Ct. 2531, 65 L.Ed.2d 597 (1980), which had permitted testimonial statements without cross-examination if they bore sufficient "indicia of reliability").

And one of the primary arguments pressed on appeal, the State also concedes, may not be considered fully by a three-judge panel of this Court. The State argues that the *Brecht* "substantial and injurious effect" harmless-error standard did not survive the passage of The Antiterrorism and Effective Death Penalty Act (AEDPA). Pub.L. No. 104–132, 110 Stat. 1214 (1996). Instead, the State contends, federal courts must view a state court's harmless error ruling through the lens of AEDPA and ask whether the state court's application of *Chapman v. California,* 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967)—requiring the error to be harmless beyond a reasonable doubt—was "unreasonable" under 28 U.S.C. § 2254(d)(1). Our Court, however, has already rejected this argument and as a result continues to view *Brecht* as the proper yardstick for measuring these claims. *See Nevers v. Killinger,* 169 F.3d 352, 371 (6th Cir.1999) (noting that "the amendments to § 2254(d) [AEDPA] do not vitiate in any way the premise set out in *Brecht*"); *see also Hill v. Hofbauer,* 337 F.3d 706, 718 (6th Cir. 2003) ("The *Brecht* standard has survived the enactment of [ ] AEDPA."); *Bulls v. Jones,* 274 F.3d 329, 335 (6th Cir.2001).

Conceding that one panel of this Court generally may not overrule the decision of another panel, the State argues that two intervening Supreme Court decisions permit us to overrule *Nevers.* Yet the two cases, *Lockyer v. Andrade,* 538 U.S. 63, 123 S.Ct. 1166, 155 L.Ed.2d 144 (2003), and *Woodford v. Visciotti,* 537 U.S. 19, 123 S.Ct. 357, 154 L.Ed.2d 279 (2002), merely explain the meaning of an "unreasonable application of clearly established federal law." Neither one specifically addresses the issue of harmless error, much less holds that *Brecht* did not survive the passage of AEDPA. *See Lockyer,* 538 U.S. at 77, 123 S.Ct. 1166 (deciding that state court did not unreasonably apply Supreme Court precedent by affirming shoplifter's two consecutive 25 years-to-life sentences);

*Woodford,* 537 U.S. at 25, 123 S.Ct. 357 (determining that a federal appeals court did not abide by the terms of § 2254(d)(1) when it substituted its own judgment for that of the state court in assessing petitioner's ineffective assistance of counsel claim). Since the Supreme Court issued both of these decisions, this Court has continued to adhere to *Nevers* and its requirement that we apply the *Brecht* standard. *See Hill,* 337 F.3d at 718 (post-*Lockyer* and post-*Woodford* case identifying *Brecht* as the appropriate harmless error standard for habeas cases).

### III.

The only remaining question—and the only serious question on appeal—is whether the unconstitutional admission of the Collier confession amounted to harmless error under *Brecht.* We agree with the district court that it did not.

*Brecht* requires federal courts to review the state trial court record to determine whether the erroneously-admitted evidence (here, Collier's confession) likely had a "substantial and injurious effect or influence in determining the jury's verdict." *Brecht,* 507 U.S. at 623, 113 S.Ct. 1710 (quoting *Kotteakos v. United States,* 328 U.S. 750, 776, 66 S.Ct. 1239, 90 L.Ed. 1557 (1946)). The *Brecht* test, we are told, is not one of "actual prejudice," which is to say it is not a test that asks us to look at the evidence, subtract out the confession, then determine whether the properly-admitted evidence suffices to convict. *See O'Neal v. McAninch,* 513 U.S. 432, 438—39, 115 S.Ct. 992, 130 L.Ed.2d 947 (1995) (noting that *Brecht* is not controlling to the extent it requires a petitioner to establish "actual prejudice"); *see also Kotteakos,* 328 U.S. at 764—65, 66 S.Ct. 1239 (stating that the proper inquiry under the federal harmless error review statute is not whether the jurors "were [ ] right in their

judgment" or whether "there was enough to support the result, apart from the phase affected by the error"); *Caldwell v. Bell,* 288 F.3d 838, 842—43 (6th Cir.2002). Rather, the question is whether "the error itself had substantial influence" on the verdict even if the evidence otherwise supported the verdict, and "[i]f so, or if one is left in grave doubt, the conviction cannot stand." *Caldwell,* 288 F.3d at 842.

The admission of Collier's confession potentially had a "substantial and injurious effect" on the verdict in two ways—identification and premeditation. As to identification, we agree with the State (and disagree with the district court) that the evidence connecting Scott to the shooting, even without Collier's confession, was so considerable as to make the possibility that the confession would undermine the essential fairness of the jury's deliberations quite improbable. Acquaintances of Scott saw him wearing a long black trench coat and in possession of a sawed-off shotgun both before and after the murder. Immediately after she heard the gunshot, Yolanda Pezzat saw a man wearing a black trench coat (whom she later identified as Scott) pointing a gun toward the driver's side of the victim's car. Dean Patton saw the man in the trench coat (whom he too identified as Scott) placing the shotgun inside his waistband under his coat in the moments following the murder as he ran back and forth between the victim's car and his own car. And Michelle Swartz, Collier's girlfriend, testified that Collier told her later that day that Scott had shot someone. Even if one characterizes this testimony as circumstantial evidence (which it was) and even if one characterizes the Collier confession as direct evidence (which it was), the circumstantial evidence was so overwhelming as to make immaterial the risk that the admission of the Collier confession would

have a "substantial and injurious effect" on the jury's deliberations over identification.

Premeditation is a different matter. While the State presented overwhelming admissible evidence of the shooter's identity, it presented little admissible evidence on premeditation—the key element distinguishing first-degree premeditated murder under Michigan law from felony murder or second-degree murder. In addition to the confession, the State presented only one other material piece of evidence regarding premeditation. The medical examiner testified that the gun was no more than six inches from the victim's face when it was fired, and the car window between Scott and Lilley was three-quarters of the way rolled up and unshattered by the shooting—suggesting that Scott must have taken enough care to stick his weapon through the open top of the window to point it at Lilley.

Michigan law, it is true, permits jurors to draw an inference of premeditation from the surrounding circumstances of a murder, including inferences from the weapon used and the location of the victim's wounds. *See People v. Plummer,* 229 Mich.App. 293, 581 N.W.2d 753, 757 (1998). So in this sense, the medical examiner's testimony was quite relevant and by itself might well have sufficed to convict Scott and establish premeditation in the process. But the likelihood that the jurors would have accepted the chain of inferences that this circumstantial evidence required had they not heard Collier's confession requires considerable faith in the State's case, and indeed more faith than *Brecht* allows. *See Bulls,* 274 F.3d at 337 (determining that the illegal admission of a co-defendant's confession had a "substantial and injurious influence in determining the jury's verdict" because the co-defendant's statement "obviated the need for the jury

to infer anything, and directly supplied evidence of the disputed element of malice"); *Calvert v. Wilson,* 288 F.3d 823, 835 (6th Cir.2002) ("With the [unconstitutional] admission of [the co-defendant's] statement, the jury had no need to engage in any inferences at all.... We must conclude, therefore, that the admission of [the] statement had a substantial and injurious influence in determining the jury's verdict.").

Consider the differences between the State's evidence of premeditation with and without the confession. With the confession, the State could show that Collier and Scott planned to rob someone, that Scott instructed Collier to back the car up to the victim's car, that Scott pointed the shotgun at the victim and demanded his money, that Scott tapped the gun on the victim's face and, when Lilley resisted, that "Six–Nine shot him." Without the confession, the State could show (through the medical examiner's testimony) that the shooting occurred at close range and that Scott managed to point the gun through a relatively narrow opening in the window of the victim's car.

The difference between these two evidentiary settings assuredly would have had a significant impact on a jury's deliberations over premeditation. Collier's statement that "Six–Nine shot him," along with other parts of the confession, ruled out the possibility that the gun fired accidentally when the victim refused to hand over his money. Without Collier's confession, the record also would have contained little evidence of a "second look" or moment of deliberation as required for premeditation under Michigan law. *See People v. Glover,* 154 Mich.App. 22, 397 N.W.2d 199, 202—03 (1986); *see also Hill,* 337 F.3d at 720 (*Brecht* satisfied where co-defendant's wrongly-admitted confession supplied the only evidence that the defen-

dant knew that his cohort had a weapon, which under state law satisfied the intent element for aiding and abetting a murder).

The prosecution's use of the confession during the trial bolsters this conclusion. The prosecutor relied heavily on Collier's statement during closing arguments, and specifically linked it to the issue of premeditation. The prosecutor recounted Collier's statement that the two men went looking for money and borrowed the car to go find some, that they cruised around seeking a robbery prospect, that when they found one, they backed the car up, that "Scott [got] out of the car [and] [stuck] the gun through the window of Mr. Lilley." JA 338, and that when Lilley gave "the slightest sign of resistance, [Scott] cold-bloodedly kill[ed] him." JA 349. Precious little of this evidence would have been available to the prosecution in the absence of Collier's confession.

On this record and under these circumstances, the State's concededly unconstitutional admission of Collier's confession had a "substantial and injurious effect" on the jury's deliberations regarding premeditation. Because we cannot say that the error was harmless under *Brecht,* the district court correctly granted a conditional writ of habeas corpus.

### IV.

For the foregoing reasons, we affirm the district court's judgment.