**Ronnie Lee BOWLING, Petitioner,**

v.

**Philip W. PARKER, Warden,**[1]
**Respondent.**

**Civil No. 03–28–ART.**

United States District Court,
E.D. Kentucky,
Southern Division,
London.

April 2, 2012.

---

1. The previous respondent, Glenn Haeberlin, is no longer the warden of the Kentucky State Penitentiary. Under Federal Rule of Civil Procedure 25(d), his successor, Philip W. Parker, is automatically substituted as the respondent. *See* R. 210 at 1 n. 1.

David M. Barron, Department of Public Advocacy, Frankfort, KY, Joseph Vincent Aprile, II, Lynch, Cox, Gilman & Mahan P.S.C., Louisville, KY, for Petitioner.

## MEMORANDUM OPINION & ORDER

AMUL R. THAPAR, District Judge.

Petitioner Ronnie Lee Bowling has challenged the constitutionality of the statutory standard of review for habeas corpus petitions by state-court prisoners, 28 U.S.C. § 2254(d)(1). R. 155. Because

§ 2254(d)(1) does not violate Article III, the Supremacy Clause, or the Suspension Clause, the law is constitutional and the Court will deny his motion.

## BACKGROUND

The Kentucky Supreme Court ably states the facts of the case at 942 S.W.2d 293, but the Court will summarize them here.

On January 20, 1989, Ronald Smith worked his usual midnight to 8 a.m. shift at the Jones Chevron station in London, Kentucky. Smith had $200 in the cash register when he started his shift, and he usually worked alone until 6:30 a.m. Around 5:30 a.m., two customers noticed that the gas pumps were not working. They went inside and found Smith lying face-down on the floor, dead. The cash register reflected $354 in sales over the course of the night, with a "no sale" indicated at 5:21 a.m., but the register was empty except for coins. Smith had been shot six times: three times in the back of the head, twice in the back, and once in the chest.

A month later, on February 22, 1989, Marvin Hensley opened the gas station he owned one-and-a-half miles north of London around 6:00 a.m. One customer bought $5 of gas from him at 6:15 a.m. But when another customer entered the station at 7:00 a.m., he found Hensley dead on the floor. Hensley, who was also a minister at a church in Mt. Vernon, had suffered three gunshot wounds to the back of his head, one to his ear, one to the back of his neck, and one to his hand. Again, the station's cash register was empty except for coins.

The Smith and Hensley murders received extensive attention in the local news, and gas station operators began to take additional security precautions. One such operator was Ricky Smith (no relation to Ronald), who owned and operated a Sunoco station on U.S. Highway 25 in Mt. Vernon, Kentucky. On February 25, 1989, Smith opened his station around 6:00 a.m. Not long afterward, Ronnie Lee Bowling entered the station. Bowling told Smith he was looking for a job, but kept his hands in his pockets and asked Smith if the station ever had two employees on duty at the same time. Smith also recalled that Bowling was looking out the station window, up and down the highway in both directions.

Smith told Bowling that the station was not hiring, and Bowling began to leave. But as Bowling exited, he pulled out a revolver and started firing at Smith. Reacting quickly, Smith dove behind a wall and metal desk and pulled out his own gun. When he heard Bowling finish shooting, Smith returned fire at Bowling through the wall. When Smith fired back, Bowling ran out of the station, jumped in to his car, and headed south on Highway 25.

Smith called the Kentucky State Police, told them what happened, and gave them a description of Bowling. State Police Troopers Allen Lewis and Danny Alton quickly intercepted Bowling's car and began pursuing it. When Lewis switched on his blue lights, Bowling responded by accelerating. The pursuit continued for more than thirty miles, and, according to Lewis, frequently exceeded speeds of 100 mph. By the time Bowling stopped at an area near his residence, eight to ten other police cars were involved in the chase. The police arrested Bowling and noticed that he was bleeding from his head.

During the chase, police observed Bowling throw two brown objects out of his car near the nine-mile marker of Kentucky Highway 472. When police returned to this location, they found a pair of brown gloves. State police troopers searching the entire route of the chase made an even more important discovery—near the area

where the chase began, they found a .38–caliber handgun. Ricky Smith identified the gun as similar to the one Bowling brandished at the Sunoco station.

When the police arrested Bowling, he told them that he entered Ricky Smith's gas station to look for a job. During the conversation, Smith lost his temper and began shooting. Bowling claimed that he never had a gun at the gas station, and that he did not throw anything out of his car while fleeing from the police. Bowling also denied ever owning a pistol. When Bowling gave his initial statement to the police, he was bleeding because one of Smith's shots had grazed the side of his head.

Bowling's trial lasted from September 21 to October 9, 1992. At the trial, a Kentucky State Police forensic scientist presented evidence of tests that analyzed the lands and grooves of the .38–caliber handgun the police found on the side of the road and the bullets found at the crime scenes. These tests revealed that one of the bullets that killed Ronald Smith and four of the bullets that killed Marvin Hensley matched the .38–caliber handgun. Bullets found at the third crime scene, Ricky Smith's Sunoco station, were too badly warped for the forensic scientist to conclusively tie them to the .38–caliber handgun. The bullets were, however, the type a .38–caliber revolver could have fired.

The Kentucky State Police also sent the bullets to the FBI for additional testing. Donald Havekost, an FBI forensic scientist, conducted a comparative metallurgical analysis of the lead in the bullets through a process known as compositional analysis of bullet lead (CABL) or comparative bullet lead analysis (CBLA). From this analysis, he linked bullets that killed Hensley and Smith with each other and with bullets found in an ammunition box at Bowling's home.

A federal prisoner named Timothy Chappell also testified at Bowling's trial. Chappell was detained in the Laurel County Jail at the same time as Bowling, and he testified that Bowling confessed the two murders to him. According to Chappell, Bowling said he was sorry about shooting Hensley because he did not know that Hensley was a preacher. Bowling also said he had killed the men because a service station attendant had once made a pass at his wife and all service station attendants were the same.

Another witness at Bowling's trial was his ex-wife, Ora Lee Isaacs. Isaacs was married to Bowling at the time of the crimes, but the two divorced before trial. She identified the gun found by the side of the road as belonging to Bowling, and testified that on the mornings of the crimes, Bowling left home around 5:30 a.m. and returned around 7:30 a.m.

To rebut this testimony, Bowling called various members of his family as witnesses. Bowling's father, Ledford, testified that he was the owner of a .38–caliber handgun, and the ammunition the police found in Bowling's mobile home belonged to him. Bowling's aunt and uncle testified that on the day of the Ronald Smith murder, Bowling was with them in Indiana. And according to Bowling's younger sister and one of her friends, Bowling's car was parked in front of his trailer with frost on the windshield around 7:15 a.m. on February 22, 1989, the morning of the Hensley murder.

Bowling also called April Lunsford as a witness. Lunsford testified that she spent the night of February 21, 1989, with Bowling at the Kozy Motel, and that Bowling left her the next morning around 7:00 a.m. She produced a registration card from the motel for that evening. The card had been filled out by Bowling's cousin, who worked at the motel.

After deliberating for one day, the jury found Bowling guilty of murder, first-degree burglary, and first-degree robbery for both the Smith and Hensley killings. The jury returned a sentence of death for each of the murders and gave Bowling a twenty-year sentence for the burglary and robbery convictions. The trial judge formally sentenced Bowling and entered judgment on December 4, 1992. Bowling then filed a direct appeal of his conviction, which the Kentucky Supreme Court rejected on June 19, 1997. The U.S. Supreme Court denied Bowling's petition for writ of certiorari a few months later. 522 U.S. 986, 118 S.Ct. 451,.

After pursuing postconviction review in Kentucky courts, Bowling began a collateral attack on his conviction in federal court. He filed a habeas petition alleging sixty-eight grounds for relief on January 15, 2003. The Court dismissed his petition for failing to exhaust his state remedies. R. 12. In August 2007, however, the Sixth Circuit disagreed and remanded the petition to the Court for a decision on the merits. 246 Fed.Appx. 303. Bowling now raises a facial challenge to the constitutionality of the standard for federal habeas review, 28 U.S.C. § 2254(d)(1). R. 155.

## DISCUSSION

The statute at issue, § 2254(d)(1), prevents a federal court from granting habeas relief to a state prisoner on "any claim that was adjudicated on the merits in State court proceedings" unless the state court's decision "was contrary to, or involved an unreasonable application of clearly established Federal law, as determined by the Supreme Court of the United States."

Bowling argues that this section violates three constitutional provisions: Article III, the Supremacy Clause, and the Suspension Clause. On all three fronts, the Court does not tread on virgin territory. Several court of appeals have considered the constitutionality of § 2254(d)(1), and each has upheld the law. *See Evans v. Thompson,* 518 F.3d 1 (1st Cir.2008); *Crater v. Galaza,* 491 F.3d 1119 (9th Cir.2007); *Green v. French,* 143 F.3d 865 (4th Cir.1998), *overruled on other grounds by Williams v. Taylor,* 529 U.S. 362, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000); *Lindh v. Murphy,* 96 F.3d 856 (7th Cir.1996) (en banc), *rev'd on other grounds,* 521 U.S. 320, 117 S.Ct. 2059, 138 L.Ed.2d 481 (1997); *see also Olona v. Williams,* 13 Fed.Appx. 745 (10th Cir.2001); *Mitchell v. Johnson,* 252 F.3d 434 (5th Cir.2001) (per curiam) (unpublished table decision). Nevertheless, the Sixth Circuit has not yet spoken on the constitutionality of § 2254(d)(1), so the Court will outline two fundamental, yet related, principles about the structure of our federal system before considering each of Bowling's arguments in turn.

## I. Constitutional Structure

■ Principle number one: state courts are capable interpreters of federal constitutional law. When faced with the question of whether to establish lower federal courts, the Constitutional Convention adopted the "Madisonian Compromise": Congress would have the power to create lower federal courts, but not be required to do so. *See* 1 Farrand, *The Records of the Federal Convention* 125 (1911). Congress, of course, did choose to create lower federal courts. *See* Act of Sept. 24, 1789, ch. 20, 1 Stat. 82. But if, tomorrow, Congress were to abolish all federal district courts and courts of appeal, state courts would be the only forum where litigants could bring constitutional claims. *See Martin v. Hunter's Lessee,* 14 U.S. (1 Wheat.) 304, 339–41, 4 L.Ed. 97 (1816) (noting that Congress had "discretion ... to establish, or not to establish inferior courts," and that "the very nature" of state courts' judicial duties would require them to decide cases "according to the constitu-

tion, laws and treaties of the United States—'the supreme law of the land' "); *see also* James E. Pfander, *Federal Supremacy, State Court Inferiority, and Jurisdiction–Stripping Legislation,* 101 Nw. U.L.Rev. 191, 198 (2007) ("Article I appears to implement the Madisonian Compromise by giving Congress a choice either to create Article III courts or to rely on appointed state courts instead (as the old Congress had done under the Articles of Confederation)."). For the first century of our nation's history, state courts were the primary forum for litigating federal constitutional rights. Congress did not give lower federal courts general federal question jurisdiction until 1875, and it did not extend the writ of habeas corpus to state prisoners until 1867. *See* Judiciary Act of Mar. 3, 1875, 18 Stat. 470; Act of Feb. 5, 1867, 14 Stat. 385.

 Congress had solid reasons to trust state courts. Through the Supremacy Clause, state and federal courts alike are bound to "guard and protect rights secured by the Constitution." *Ex Parte Royall,* 117 U.S. 241, 251, 6 S.Ct. 734, 29 L.Ed. 868 (1886). As a result, our federal system relies on "two essentially separate legal systems. Each system proceeds independently of the other with ultimate review in [the Supreme] Court of the federal questions raised in either system." *Atl. Coast Line R.R. Co. v. Bd. of Locomotive Eng'rs,* 398 U.S. 281, 286, 90 S.Ct. 1739, 26 L.Ed.2d 234 (1970). State courts even have the exclusive power to adjudicate some types of federal constitutional claims. *See, e.g., Stone v. Powell,* 428 U.S. 465, 96 S.Ct. 3037, 49 L.Ed.2d 1067 (1976) (Fourth Amendment habeas claims); *Younger v. Harris,* 401 U.S. 37, 91 S.Ct. 746, 27 L.Ed.2d 669 (1971) (pending state criminal prosecutions); *Allen v. McCurry,* 449 U.S. 90, 101 S.Ct. 411, 66 L.Ed.2d 308 (1980) (collateral estoppel for state court judgments of 42 U.S.C. § 1983 suits). Federal courts also may not reopen the civil judg-ments of state courts to evaluate their correctness—no matter how many constitutional questions the state courts' decisions touch on—except through the certiorari jurisdiction of the Supreme Court. *See, e.g., Exxon Mobil Corp. v. Saudi Basic Indus. Corp.,* 544 U.S. 280, 284, 125 S.Ct. 1517, 161 L.Ed.2d 454 (2005) (explaining that, under the *Rooker–Feldman* doctrine, a federal district court lacks subject-matter jurisdiction to hear direct appeals from "unfavorable state-court judgments"). State courts' criminal procedure decisions are entitled to no less respect. The Supreme Court presumes that "state courts know and follow the law" when they decide federal constitutional questions. *Woodford v. Visciotti,* 537 U.S. 19, 24, 123 S.Ct. 357, 154 L.Ed.2d 279 (2002) (per curiam); *see also Lambrix v. Singletary,* 520 U.S. 518, 532 n. 4, 117 S.Ct. 1517, 137 L.Ed.2d 771 (1997) (noting that "[o]ur cases establish that ... [state court] judges are presumed to know the law and apply it in making their decisions").

 Principle number two: lower federal courts derive the entirety of their jurisdiction from statutes, not Article III. The judicial power of federal district courts and courts of appeals depends "entirely upon the action of Congress, who possess the sole power of creating the tribunals inferior to the Supreme Court." *Cary v. Curtis,* 44 U.S. (3 How.) 236, 245, 11 L.Ed. 576 (1845) (internal parentheses omitted). The amount in controversy requirement for diversity jurisdiction, a bête noire for defendants seeking to remove cases to this Court, *see, e.g., May v. Wal–Mart Stores, Inc.,* 751 F.Supp.2d 946 (E.D.Ky.2010), is but one example of this principle. Article III allows the federal judicial power to extend to a suit between citizens of two different states, no matter how much money is in dispute. But Congress has chosen to withhold jurisdiction

over that suit from the federal courts unless the amount in controversy is at least one penny more than $75,000. *See* 28 U.S.C. § 1332(a); *Freeland v. Liberty Mut. Fire Ins. Co.*, 632 F.3d 250, 252–53 (6th Cir.2011). That congressional decision is constitutional because "[c]ourts created by statute can have no jurisdiction but such as the statute confers," *Sheldon v. Sill*, 49 U.S. (8 How.) 441, 448–49, 12 L.Ed. 1147 (1850); *see also Lauf v. E.G. Shinner & Co.*, 303 U.S. 323, 330, 58 S.Ct. 578, 82 L.Ed. 872 (1938) (holding that Congress could withdraw the power to issue injunctions in labor disputes from federal courts).

 Habeas review of state court convictions is no different: lower federal courts derive their jurisdiction from statutes of Congress. *See* Act of Feb. 5, 1867, ch. 28, 14 Stat. 385 (extending habeas to state prisoners for first time); *Ex Parte Bollman & Swartwout*, 8 U.S. (4 Cranch) 75, 94, 2 L.Ed. 554 (1807) (Marshall, C.J.) ("[T]he power to award the writ by any of the courts of the United States must be given by written law."). Of course, congressional power is not absolute. A lower federal court might be the only venue where a prisoner can bring a habeas petition, and, in those cases, the Suspension Clause forbids Congress from withdrawing jurisdiction. *See Boumediene v. Bush*, 553 U.S. 723, 787–92, 128 S.Ct. 2229, 171 L.Ed.2d 41 (2008). But that is not the case for prisoners seeking review of state court convictions in lower federal courts. These prisoners may bring a habeas petition in state court, or in the original jurisdiction of the Supreme Court. *See In re Davis*, —— U.S. ——, 130 S.Ct. 1, 174 L.Ed.2d 614 (2009) (using original habeas jurisdiction to transfer a petition to a federal district court for adjudication on the merits); *Felker v. Turpin*, 518 U.S. 651, 658–62, 116 S.Ct. 2333, 135 L.Ed.2d 827 (1996) (concluding that restrictions on habeas relief did not "deprive this Court of

jurisdiction to entertain original habeas petitions"). Congress may therefore expand or contract lower federal courts' power to grant habeas relief to state prisoners as it pleases.

## II. Article III

 Bowling first claims that § 2254(d)(1) impermissibly "dictates what case law a federal court may use to decide a case" by limiting relief to situations controlled by "clearly established federal law" as determined by the Supreme Court. R. 155 at 11. As a first matter, this argument overstates the effect of § 2254(d)(1). Federal courts are not forbidden from considering lower court decisions' in habeas review. *See Aspen v. Bissonnette*, 480 F.3d 571, 574 (1st Cir.2007) ("Decisions from the lower federal courts may help inform the AEDPA analysis to the extent that they state the clearly established federal law determined by the Supreme Court."). The Sixth Circuit routinely considers court of appeal decisions to the extent they "have already reviewed and interpreted the relevant Supreme Court case law to determine whether a legal principle or right had been clearly established by the Supreme Court." *Smith v. Stegall*, 385 F.3d 993, 998 (6th Cir.2004) (quoting *Hill v. Hofbauer*, 337 F.3d 706, 717 (6th Cir.2003)); *see also Walker v. McQuiggan*, 656 F.3d 311, 321 & n. 8 (6th Cir.2011) (relying on Sixth Circuit precedent to determine that *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), clearly established that a defendant need only show that an insanity defense would have been "substantial" to prove ineffective assistance of counsel); *Hill*, 337 F.3d at 717 (holding that admitting a co-defendant's custodial statements against a defendant was contrary to clearly established federal law based on other circuit courts' interpretations of prior Supreme Court decisions); *Ruimveld v.*

*Birkett,* 404 F.3d 1006, 1015 (6th Cir.2005) (relying on decisions by "a wide array of lower courts" to conclude that the Supreme Court had "clearly stated that indicia of guilt such as shackles harm a defendant's presumption of innocence").

 But even if § 2254(d)(1) did limit the sources of law a lower federal court could rely on, such a restriction would be constitutional. Congress routinely limits the sources of information a federal court can take into account when making a decision. The Federal Rules of Evidence, for instance, instruct district courts to consider or refuse to consider certain kinds of facts. As Judge Easterbrook has pointed out, "[I]f the process of adjudication really is independent of legislative control, all procedural rules predating the Rules Enabling Act of 1936—and all statutes overriding rules promulgated by judges under that law—must be unconstitutional too." *French v. Duckworth,* 178 F.3d 437, 450 (7th Cir.1999) (Easterbrook, J., dissenting from denial of rehearing en banc), *rev'd by Miller v. French,* 530 U.S. 327, 120 S.Ct. 2246, 147 L.Ed.2d 326 (2000). Congress also frequently mandates a particular legal standard to federal courts. The Administrative Procedure Act, for instance, requires a deferential standard of review for appeals from administrative agencies' decisions. *See* 5 U.S.C. § 706 (directing courts to set aside the actions of administrative agencies when they are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law" or "unsupported by any substantial evidence"). These restrictions on lower federal courts' discretion are constitutional because the Necessary and Proper Clause of Article I grants Congress the power to "make laws for carrying into execution all the judgments which the judicial department has power to pronounce." *Wayman v. Southard,* 23 U.S. (10 Wheat.) 1, 22, 6 L.Ed. 253 (1825) (Marshall, C.J.). Nevertheless, there are limits on the congressional power to provide rules for how the judiciary may exercise its jurisdiction: Congress may not direct the courts to decide cases "in a particular way," *United States v. Klein,* 80 U.S. (13 Wall.) 128, 146, 20 L.Ed. 519 (1871), or reopen final judgments, *see Plaut v. Spendthrift Farm, Inc.,* 514 U.S. 211, 240, 115 S.Ct. 1447, 131 L.Ed.2d 328 (1995). But within those boundaries, the Necessary and Proper Clause hands Congress the reins over federal courts' operation. Just as Congress can instruct courts to admit or exclude certain facts through the Federal Rules of Evidence, the Necessary and Proper Clause allows Congress to "consult the criteria the courts consult in formulating rules of precedent and ... adopt any rule a court could reasonably adopt." John Harrison, *The Power of Congress over the Rules of Precedent,* 50 Duke L.J. 503, 542 (2000).

 To the extent § 2254(d)(1) limits the sources of a precedent a federal court can consider, that limit is a logical one. In habeas, lower federal courts review the decisions of state courts, and those state courts are only bound by the Supreme Court. *Lockhart v. Fretwell,* 506 U.S. 364, 376, 113 S.Ct. 838, 122 L.Ed.2d 180 (1993) (Thomas, J., concurring) ("[N]either federal supremacy nor any other principle of federal law requires that a state court's interpretation of federal law give way to a (lower) federal court's interpretation."). If a state court within the Sixth Circuit's geographical boundaries follows the circuit's interpretation of an unsettled federal law question, it does so "because it chooses to and not because it must." *Id.; see also Lindh,* 96 F.3d at 869 ("State courts must knuckle under to decisions of the Supreme Court, but not of this court."). A lower federal court should therefore rely on the superior authority of the Supreme Court when it "intrudes on state sovereignty to a

degree matched by few exercises of federal judicial authority" by reviewing a state conviction. *Harris v. Reed*, 489 U.S. 255, 282, 109 S.Ct. 1038, 103 L.Ed.2d 308 (1989) (Kennedy, J., dissenting). To do otherwise would make lower federal courts, rather than the Supreme Court, paramount over state courts.

Bowling argues that § 2254(d)(1) is akin to the law at stake in *United States v. Klein*, 80 U.S. (13 Wall.) 128, 20 L.Ed. 519 (1871)—an unconstitutional attempt by Congress to prescribe a rule of decision to Article III courts. But this argument misreads *Klein*. That case involved a former supporter of the Confederacy who had received a presidential pardon and sought to recover property the government had confiscated from him during the Civil War. While the federal courts considered his claim, Congress passed a law that effectively directed the courts to rule against him. *Id.* at 146–47. In any case where the statute applied, no court could find in favor of a pardon recipient trying to reclaim his property.

Section 2254(d)(1), by contrast, does not tell courts when they can or cannot find a constitutional violation. The statute does not attempt to reopen a court's final judgment, mandate that courts favor a particular interpretation of federal law, or dictate a particular result in any pending case. Instead, it "sets additional standards for granting relief in cases where a petitioner has already received an adjudication of his federal claims by another court of competent jurisdiction." *Crater*, 491 F.3d at 1127. A federal court can decide that a habeas petitioner suffered a constitutional violation, and the only effect of § 2254(d)(1) is to limit the court's choice of remedies under certain circumstances. To put it bluntly, merits and relief are two different questions. *See Lindh*, 96 F.3d at 872 ("Regulating relief is a far cry from limiting the interpretive power of the courts, however, and Congress has ample power to adjust the circumstances under which the remedy of the writ of habeas corpus is deployed."). Ever since 1793, Congress has limited a federal court's discretion to employ—or decline to employ—certain remedies. *See* Anti–Injunction Act, 1 Stat. 333, 334–35 (codified at 28 U.S.C. § 2283); *Tenn. Valley Auth. v. Hill*, 437 U.S. 153, 187–88, 98 S.Ct. 2279, 57 L.Ed.2d 117 (1978) (holding that the Endangered Species Act required a district court to issue an injunction blocking construction of a dam that would eradicate a population of endangered snail darters).

In other contexts, Congress has limited the remedies available for violations of constitutional rights, and the Supreme Court has upheld the constitutionality of those limits. *See, e.g., Chapman v. California*, 386 U.S. 18, 22, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967) (upholding the constitutionality of 28 U.S.C. § 2111, which forbids courts from reversing judgments on the basis of "errors or defects which do not affect the substantial rights of the parties"); *see also* Henry M. Hart, Jr., *The Power of Congress To Limit the Jurisdiction of Federal Courts: An Exercise in Dialectic*, 66 Harv. L.Rev. 1362, 1366 (1953) ("It must be plain that Congress necessarily has a wide choice in the selection of remedies, and that a complaint about action of this kind can rarely be of constitutional dimension."). Indeed, the gap between merits and relief is a routine feature of constitutional law. *See, e.g., United States v. Leon*, 468 U.S. 897, 104 S.Ct. 3405, 82 L.Ed.2d 677 (1984) (good faith exception to the exclusionary rule); *Nix v. Williams*, 467 U.S. 431, 104 S.Ct. 2501, 81 L.Ed.2d 377 (1984) (independent discovery exception to the exclusionary rule); *Stone*, 428 U.S. at 465, 96 S.Ct. 3037 (Fourth Amendment claims are not cognizable in habeas). That gap is particularly stark in many civil rights lawsuits, where

the qualified immunity doctrine only allows a plaintiff to recover if his constitutional rights were sufficiently well established so that a reasonable official would have understood that his actions violated those rights. *See, e.g., Pearson v. Callahan,* 555 U.S. 223, 244–45, 129 S.Ct. 808, 172 L.Ed.2d 565 (2009). A plaintiff might therefore suffer a violation of his constitutional rights, yet find that no remedy is available.

Limits on habeas remedies are no different. The Supreme Court has repeatedly upheld restrictions on habeas, even through a petitioner's arguments may have merit. *See, e.g., Felker,* 518 U.S. at 664, 116 S.Ct. 2333 (upholding 28 U.S.C. § 2244(b), which prevents federal courts from considering successive habeas petitions); *Teague v. Lane,* 489 U.S. 288, 308, 109 S.Ct. 1060, 103 L.Ed.2d 334 (1989) (habeas petitioners may only assert constitutional rights that existed at the time of their conviction); *Wainwright v. Sykes,* 433 U.S. 72, 87, 97 S.Ct. 2497, 53 L.Ed.2d 594 (1977) (habeas petitioners may only raise claims that they previously litigated in state courts unless they can show good cause and prejudice); *see also Lonchar v. Thomas,* 517 U.S. 314, 322, 116 S.Ct. 1293, 134 L.Ed.2d 440 (1996) (noting that Congress and the courts have "developed more complex procedural principles" that govern habeas relief and "narrow the discretion that individual judges can freely exercise"). Under § 2254(d)(1), federal courts still make independent determinations of whether a petitioner's rights were violated, then look to Supreme Court precedent to decide whether they can grant relief. The statute limits remedies rather than mandating a rule of decision. As a result, § 2254(d)(1) does not run afoul of Article III.

### III. Supremacy Clause

■ Bowling next argues that § 2254(d)(1) violates the Supremacy Clause of Article VI because it "allows state courts to be the final arbiter of federal constitutional law even when the state court decision is incorrect." R. 155 at 11. But that is exactly the opposite of what the law does. A federal court may grant relief under § 2254(d)(1) when a state court's decision is "contrary to, or involves an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." That text firmly places the Supreme Court in the driver's seat of federal constitutional law. If, for example, a Kentucky court held that the Sixth Amendment did not require the state to provide indigent defendants with appointed counsel in felony prosecutions, this Court would grant habeas because the Kentucky court's decision was contrary to the clearly established federal law of *Gideon v. Wainwright,* 372 U.S. 335, 83 S.Ct. 792, 9 L.Ed.2d 799 (1963). Even if the Kentucky court made a compelling argument for why *Gideon* misunderstood the Sixth Amendment, § 2254(d)(1) mandates that the Supreme Court's interpretation carry the day. *See Lindh,* 96 F.3d at 869. Justice Stevens reached a similar conclusion in his separate opinion in *Williams v. Taylor,* noting that § 2254(d)(1) "directs federal courts to attend to every state-court judgment with utmost care, but it does not require them to defer to the opinion of every reasonable state-court judge on the content of federal law." 529 U.S. 362, 389, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000).

Just as the Supreme Court is not a puppet in federal constitutional law, neither is it a mere figurehead. Bowling argues that the Supreme Court does not really control constitutional interpretation because § 2254(d)(1) effectively gives state courts the last word on a federal constitution when there is no clearly established Supreme Court precedent. R. 155 at 22.

This argument is wrong both in fact and in theory.

In Bowling's case, for example, the Supreme Court has had five opportunities to rule on constitutional questions: first on direct appeal, *Bowling v. Kentucky*, 522 U.S. 986, 118 S.Ct. 451, 139 L.Ed.2d 387 (1997); second on state post-conviction review, 538 U.S. 931, 123 S.Ct. 1587, 155 L.Ed.2d 327 (2003); third on Bowling's initial motion for a new trial, 546 U.S. 1153, 126 S.Ct. 1171, 163 L.Ed.2d 1133 (2006); fourth on his second motion for a new trial, —— U.S. ——, 130 S.Ct. 1053, 175 L.Ed.2d 893 (2010); and fifth on his state habeas petition, *Bowling v. Parker*, —— U.S. ——, 132 S.Ct. 260, 181 L.Ed.2d 151 (2011). After this Court rules on Bowling's habeas petition, he will likely have a sixth chance for Supreme Court review. The Supreme Court's denial of certiorari does not speak one way or the other about the merits of Bowling's constitutional claims. *See Daniels v. Allen*, 344 U.S. 443, 497, 73 S.Ct. 437, 97 L.Ed. 469 (1953) (opinion of Frankfurter, J.) ("[I]n habeas corpus cases, as in others, denial of certiorari cannot be interpreted as an expression of opinion on the merits."). But silence does dispel Bowling's claim that state courts have toppled the Supreme Court from its perch atop our nation's judicial hierarchy.

And in the circumstances Bowling fears, where no Supreme Court precedent addresses an issue, a state court's ruling is not the final word on federal constitutional law. As described in Section I, *supra*, state courts "have inherent authority, and are thus presumptively competent, to adjudicate claims arising under the laws of the United States." *Tafflin v. Levitt*, 493 U.S. 455, 458–59, 110 S.Ct. 792, 107 L.Ed.2d 887 (1990). But the Supreme Court has jurisdiction over the final judgments of state courts, 28 U.S.C. § 1257(a), and state-court authority "knuckle[s] under" to a

contrary decision by the Supreme Court, *Lindh*, 96 F.3d at 869. If a state court decides a novel federal constitutional question, its interpretation only carries weight until the Supreme Court speaks. Similarly, this Court's interpretation of an issue of first impression (like the constitutionality of § 2254(d)(1)) only carries weight until the Sixth Circuit or Supreme Court enters the fray. If neither party appeals this Court's decision, this Court is not the final interpreter of the Constitution—its interpretation will only stand until another case arises on the same issue and a higher court rules. State courts' interpretations are much the same. Section 2254(d)(1) may allow state courts' adjudications to survive collateral review, but only until the Supreme Court speaks.

## IV. Suspension Clause

 Bowling's final argument, that § 2254(d)(1) effectively suspends the writ of habeas corpus, is also unpersuasive. "[A]t an absolute minimum, the Suspension Clause protects the writ 'as it existed in 1789.'" *INS v. St. Cyr*, 533 U.S. 289, 301, 121 S.Ct. 2271, 150 L.Ed.2d 347 (2001) (quoting *Felker*, 518 U.S. at 663–64, 116 S.Ct. 2333). And at the Founding, habeas was primarily a means of reviewing the legality of executive detention that occurred without judicial process. *See, e.g., Brown v. Allen*, 344 U.S. 443, 533, 73 S.Ct. 397, 97 L.Ed. 469 (1953) (Jackson, J., concurring in result) ("The historic purpose of the writ has been to relieve detention by executive authorities without judicial trial."); 3 Joseph Story, *Commentaries on the Constitution of the United States* § 1333 at 206 (1833) (stating that habeas exists to ascertain whether a "sufficient ground of detention appears"). Although Congress could—and did—later expand habeas jurisdiction to permit challenges to one's detention *after* judicial process, such grants were discretionary and

could always be repealed. In *Ex Parte McCardle,* for instance, the Supreme Court upheld the constitutionality of a statute that repealed the entirety of its appellate jurisdiction over collateral review. *See* 74 U.S. (7 Wall.) 506, 513–14, 19 L.Ed. 264 (1869). *Boumediene v. Bush,* 553 U.S. 723, 128 S.Ct. 2229, 171 L.Ed.2d 41 (2008), also confirms this reading of the Suspension Clause. In that case, the Supreme Court held that the Suspension Clause requires a right to habeas review for individuals detained without judicial process. 553 U.S. at 772, 128 S.Ct. 2229. By contrast, Section 2254(d)(1) only restricts habeas remedies available to individuals who have already had an opportunity for judicial process in the state courts and in the Supreme Court on direct appeal. That decision is firmly within the powers of Congress.

And even if the Suspension Clause required Congress to retain federal jurisdiction over collateral attacks, § 2254(d)(1) only modifies the conditions in which a federal court can grant relief. The statute does not withdraw jurisdiction, making it more akin to the law at stake in *Felker v. Turpin,* 518 U.S. 651, 116 S.Ct. 2333, 135 L.Ed.2d 827 (1996). In *Felker,* the Supreme Court upheld the constitutionality of 28 U.S.C. § 2244(b), which banned successive habeas petitions. 518 U.S. at 664, 116 S.Ct. 2333. After all, "judgments about the proper scope of the writ are 'normally for Congress to make,'" *id.* (quoting *Lonchar v. Thomas,* 517 U.S. 314, 323, 116 S.Ct. 1293, 134 L.Ed.2d 440 (1996)), and Congress may contract courts' habeas powers as easily as it expands them. As Judge Easterbrook pointed out, "[t]he Suspension Clause is not a ratchet." *Lindh,* 96 F.3d at 868; *see also St. Cyr,* 533 U.S. at 341–42, 121 S.Ct. 2271 (Scalia, J., dissenting) (describing a one-way ratchet argument about the Suspension Clause as "too absurd to be contemplated"). Most recently, the Supreme Court has ex-plained that § 2254(d)(1) "stops short of imposing a complete bar on federal court relitigation of claims already rejected in state proceedings." *Harrington,* 131 S.Ct. at 786. For his part, Bowling argues that § 2254(d)(1)'s "hurdle is so high that it effectively deprives an inmate of meaningful habeas review." Reply Br., R. 206 at 13. But if the standard to grant habeas under § 2254(d)(1) is "difficult to meet, that is because it was meant to be." *Harrington,* 131 S.Ct. at 786. Congress has set a high bar "to ensure that habeas relief functions as a guard against extreme malfunctions ... and not as a means of error correction." *Greene v. Fisher,* — U.S. ——, 132 S.Ct. 38, 43–44, 181 L.Ed.2d 336 (2011). Section 2254(d)(1) does not violate the Suspension Clause.

## V. Conclusion

As a final matter, the constitutional foundations of § 2254(d)(1) are solidified by the Supreme Court's repeated application of the statute. Admittedly, the constitutionality of § 2254(d)(1)has never been squarely before the Supreme Court. But over the past sixteen years, the Court has consistently applied the § 2254(d)(1) standard of review to habeas petitions. *See, e.g., Lafler v. Cooper,* — U.S. ——, 132 S.Ct. 1376, 182 L.Ed.2d 398 (2012); *Howes v. Fields,* — U.S. ——, 132 S.Ct. 1181, 182 L.Ed.2d 17 (2012); *Wetzel v. Lambert,* — U.S. ——, 132 S.Ct. 1195, 182 L.Ed.2d 35 (2012); *Greene v. Fisher,* — U.S. ——, 132 S.Ct. 38, 181 L.Ed.2d 336 (2011); *Cullen v. Pinholster,* — U.S. ——, 131 S.Ct. 1388, 179 L.Ed.2d 557 (2011); *Premo v. Moore,* — U.S. ——, 131 S.Ct. 733, 178 L.Ed.2d 649 (2011); *Harrington v. Richter,* — U.S. ——, 131 S.Ct. 770, 178 L.Ed.2d 624 (2011). A simple Westlaw search reveals sixty-eight cases where the Supreme Court applied § 2254(d)(1) since 1996. And in the 2010 Term, the Supreme Court decided seven cases that involved

§ 2254(d)(1)—nearly ten percent of that Term's eighty-two cases. *See* Stat Pack for October Term 2010, SCOTUSblog, 5 (June 28, 2011), http://sblog.s3.amazonaws.com/wp-content/uploads/2011/06/SB_OT10_stat_pack_final.pdf. It would be quite curious for the Supreme Court to apply a statute more than five dozen times without any of the Justices so much as casting doubt on its validity. *Cf. Crowell v. Benson,* 285 U.S. 22, 62, 52 S.Ct. 285, 76 L.Ed. 598 (1932) ("When the validity of an act of the Congress is drawn in question ... it is a cardinal principle that this Court will first ascertain whether a construction of the statute is fairly possible by which the question may be avoided."); *Ashwander v. Tenn. Valley Auth.,* 297 U.S. 288, 346–48, 56 S.Ct. 466, 80 L.Ed. 688 (1936) (Brandeis, J., concurring) (describing canon of constitutional avoidance). The more plausible conclusion, and the one that this Court reaches, is that § 2254(d)(1) does not violate Article III, the Supremacy Clause, or the Suspension Clause.

It is therefore **ORDERED** that Bowling's motion to declare 28 U.S.C. § 2254(d)(1) unconstitutional, R. 155, is **DENIED.**